No. 64.—The MERCHANTS' BANK OF MACON, plaintiff in error, vs. The CENTRAL BANK OF GEORGIA, defendant in error.

If a person, assuming to act as the agent of a corporation, but without legal authority, makes a contract, and the corporation receive the benefit of it, and use the property acquired under it, such acts will ratify the contract, and render the corporation liable thereon.

In the execution of instruments under seal, by an agent, the general rule is, that it must purport, upon its face, to be the contract of the principal, and his name must be inserted in it, and signed to it.

In the case of instruments not under seal, executed by agents, if it appear from the face of the paper, that the credit was not given to the agent, and the name of the principal was disclosed at the time of the transaction, and the act was within the power of the agent, the principal is bound. Upon such contracts, where the intent is not sufficiently clear that the principal was to be bound, the defect may be supplied by parol testimony.

The clause, to be found in most of the bank charters in Georgia, which provides that the funds of the company shall in no case be liable for any contract or engagement whatever, unless the same shall be signed by the president, and countersigned by the cashier, of the corporation, does not apply to such contracts or engagements as occur, or are necessary to the ordinary business of a cashier or agent; such as drawing and endorsing bills of exchange, checks and drafts—acts which appertain, according to commercial usage, to the office of a cashier.

A general power to discount bills of exchange, confers on the agent the power to endorse.

In a suit by the Central Bank, no proof of notice, demand, or protest, is necessary to charge the endorser.

In a case where the holder of an endorsed paper fails to give notice of the dishonor, where notice is necessary to charge the endorser, and the endorser is therefore released in law, and the holder then transfers the paper to the Central Bank, and the endorser is sued: although on the trial the bank is not bound to prove notice, demand, or protest, yet the endorser would be let into his defence, and by proof would be permitted to show his discharge for want of notice.

This was an action, brought by the defendant in error against the plaintiff in error, in the Superior Court of the county of Bibb, upon a bill of exchange drawn by Jerry Cowles upon the Fulton Bank of New York, addressed to the cashier thereof, bearing date the 10th of January, 1842, whereby the said Cowles requested the Fulton Bank of New York to pay Scott Cray, agent, or order, ninety days after the date thereof, five thousand dollars for value received, and charge as advised.

Acceptance was waived, and the bill was endorsed by Scott Cray, agent. The declaration also contained the common money counts. The principal of Mr. Cray was not disclosed, either in the bill itself or in the endorsement. It was discounted by the Central Bank of Georgia, in renewal of a former bill for the same amount, and drawn and endorsed by the same parties. It was afterwards presented to the Fulton Bank of New York for payment, and was dishonored. It was alleged in the declaration, that the said Scott Cray received the said bill, and endorsed the same to the Central Bank, as the agent of the Bank of Hawkinsville, the name and style of which was afterwards altered and changed,

by act of the Legislature of Georgia, to that of "The Merchants' Bank of Macon," and by that name and style the said corporation was declared to be subject to all the penalties and liabilities to which it was subject under the former name of "The Bank of Hawkinsville."

This cause was tried on the appeal in the court below, before Judge Floyd, at May Term, 1846.

It was proven on the trial, by the books of the Bank of Hawkinsville, that said Scott Cray had been appointed agent of said bank, to transact at Macon, a legitimate *business* for said bank, with the power and privilege of discounting notes, and drawing and discounting bills of exchange; and that bills were sent him, from time to time, to bank upon, and for the purpose of discounting bills on Savannah, Charleston, and New York. It was proven by the testimony of the cashier of the Central Bank, A. M. Nisbet, Esq., that this bill was discounted by the Central Bank, in renewal of a former bill for the same amount, and drawn by the same parties, under the authority of the act of 1838, for the purpose of paying interest on sterling bonds of the State of Georgia, held by Messrs. Reid, Irving and Company, of London, and by the Bank of Augusta. That said Scott Cray received the proceeds of the original bill in cash, and acted in the matter, as witness understood, as the agent of the Bank of Hawkinsville.

The counsel for the defendant in error then offered to read in evidence the said bill of exchange, to which the counsel for the plaintiff in error objected, on the following grounds:

1st. That said bill was not evidence to bind the plaintiff in error, who was sought to be charged, for and by the act of a supposed agent, while the name of the principal nowhere appeared on said instrument.

2d. That the bill was not evidence against the plaintiff in error, because the endorsement was not signed by the president, and countersigned or attested by the cashier, as required by the 8th section of the charter of the Bank of Hawkinsville, before its funds could be bound for any contract or engagement whatever.

3d. That said Scott Cray exceeded all the powers conferred, and all the powers of a general agent, by endorsing said paper; the said paper never having been the property of the plaintiff in error, as was disclosed by the proof.

4th. That the bill was an *illegal* paper: both the defendant in error in receiving, and said Scott Cray (if he was agent) in passing it, violated the act of 1837, called the post-note law.

5th. That the said bill was not evidence, until or before demand and notice to the plaintiff in error had been proved. All of which objections were overruled by the court below, and the counsel permitted to read said bill in evidence to the jury.

The said Scott Cray was then introduced as a witness in behalf of the plaintiff in error, and it was proven by him that he was directed by Mr. John Rawls, President of the Bank of Hawkinsville, to procure to be discounted by the Central Bank, a draft for $8,500, for the use of the Bank of Hawkinsville, drawn by John Rawls upon Charles Hartridge, Savannah, and endorsed by H. H. Tarver. The Central Bank not wanting funds in Savannah, refused to discount it. Mr. Jerry Cowles was in Milledgeville; and in a conversation with him, stated to witness, that he

(Cowles) had Hull and Smith's New York letter of credit, authorizing him to draw for a large amount, and proposed to witness that he (Cowles) would draw on them for $10,000 for the use of the bank, and the witness should endorse his (Cowles') draft for $5,000 for his own use, to pay his debt to the Hawkinsville Bank, and for him to draw the balance. Witness informed Dr. Fort, President of the Central Bank, that he did not feel authorized—that he had never endorsed such a draft before out of bank. The two drafts were discounted, and the proceeds were paid to witness by the cashier of the Central Bank. Witness returned with the money to the agency of the Bank of Hawkinsville in Macon, where Mr. Rawls was awaiting his return, and informed him what had been done, and that he had the money, and if he (Mr. Rawls) did not approve of it, the witness would return the money to the Central Bank, and take up the draft. Witness testified that he would have done so, as he was determined to run no risk; and it was remarked that Mr. Cowles owed the bank two-thirds of the amount of said draft, which was a bad debt. Mr. Rawls, as president of the bank, approved the act of witness—the money was paid into bank, passed to Mr. Cowles' credit, and used for the redemption of the notes of the bank. A few days or weeks afterwards Mr. Cowles had a settlement with the bank, and his note for about two-thirds of the net proceeds of the $5,000 draft was satisfied, and the balance was paid to him.

The counsel for the defendant in error then introduced, and was allowed to read in evidence, the testimony of the notary public of New York, taken by commission, testifying that he protested the bill sued on, and gave due notice. No protest was produced. To which testimony of the notary public the counsel for the plaintiff in error demurred, on the ground that the bill sued on being a *foreign bill*, a protest was necessary; and that the original protest must be produced or accounted for. These points were also overruled by the court.

To which the plaintiffs in error excepted.

JOHN RUTHERFORD, for the plaintiff in error, maintained,

1st. That the court erred in admitting the bill of exchange in evidence, because the name of the *principal* (the Merchants' Bank of Macon) *nowhere appeared on* the paper; and cited 10 *Wend. Rep.* 271; *Bayley on Bills*, 74, 69; *Chitty on Bills*, (8th ed.,) 37, 254; also, 16 *Mass. R.* 44–6; 11 *ib.* 29; also, *Story on Bills*, 91; · *Story on Agency*, 147, 155, 275–8; *Bayley on Bills*, 69–74; also, 2 *Kent Com.*, sec. 41, page 630–1–4; *Mass. Rep.* 595; 13 *Johns. R.* 307; 2 *Stra.* 955; *Com. Dig. att.*, (c. 14, 15,) and notes.

2d. The court erred in admitting the paper, because it was not signed by the president and cashier as required by the charter—*Prin. Dig.* 108; 2 *Cranch R.* 156, 166–7; 12 *Wheat.* 64–9; 13 *Peters*, 587; 5 *Hill's N. Y. R.* 16, 20; *Angell and Ames on Corp.* 242, 166, 212, 167, 243; 12 *Serg. and Rawle*, 256; also, 17 *Mass. Rep.* 26; 4 *Hill's N. Y. Rep.* 447; 2 *Kent. Com.* 465; 2 *Stra.* 955–6; *Angell and Ames on Corp.* 180.

3d. Scott Cray exceeded all powers of a general agent, and Mr. Rawls could not sanction, so as to bind the bank; the evidence showing that the bank did not receive the benefit of the money, so as to be chargeable

DECATUR, AUGUST TERM, 1846.    421

The Merchants' Bank of Macon vs. The Central Bank of Georgia.

on the money count.—*Chitty on Bills*, (8th ed.,) 34; 1 *Taunt*. 347; *Chitty on Bills*, (8th ed.,) 254; 1 *East R*. 422; *Angell and Ames*, 177-8; 17 *Mass. R*. 505; 10 *ib*. 397; *Angell and Ames*, 246; 6 *Pet*. 51; 8 *ib*. 16; 1 *Greenl. Rep*. 81; 17 *Mass. R*. 1; 14 *ib*. 58; 17 *ib*. 479; 18 *ib*. 215. The bill is not evidence under the money count. —*Story on Bills*, 515; 1 *Conn. R*. 409.

4th. The court erred in admitting the bill, because it was passed by S. Cray, and received by the Central Bank, in violation of the " post-note" law of 1837.—2 *Hill's N. Y. R*. 241; 7 *Wend*. 31; 3 *ib*. 583; 2 *Con. R*. 678; *Angell and Ames on Corp*. 193; 19 *Johns. R*. 1; 8 *Cowen*, 20; 15 *Wend*. 412; 24 *ib*. 24.

The general rules of illegal contracts.—*Chitty on Con*., new ed., 637, 695, 419; 10 *Bing*. 107; 5 *Johns. R*. 326; 2 *Kent. Com*. 364; 13 *Ves*. 581; *Dudley's Geo. R*. 250; 3 *T. R*. 266.

5th. And lastly, the court erred in not withdrawing from the jury the testimony of the New York notary, proving demand, protest and notice; because nothing but the *original* protest can prove a protest on a foreign bill. As to its being a foreign bill, see *Bayley on Bills*, 21, *and notes*. Protest necessary.—*Chitty on Bills*, (8th ed.,) 489, 509; 4 *Harr. and Johns*. 54; 2 *T. R*. 713; 5 *ib*. 239; 9 *Porter Ala. R*. 131.

CHARLES J. McDONALD, for the defendant in error.

It is necessary, in reviewing the decision of the court below, which is brought up by the bill of exceptions, to look into the state of the pleadings.

There are two counts in the declaration—one a special, the other a common count. In the special count, there is no averment of a notice to the endorser, though there is an averment of a demand upon the drawer, and his refusal to pay.

The first exception is founded on the decision of the court below, in overruling the objection, that the name of the principal nowhere appears on the instrument.

That the paper was payable to Scott Cray, as agent, appears on its face, and his endorsement is as agent. It appears, then, from the bill of exchange itself, that it was *not* his individual business, and that he had a a principal. The testimony from the books of the Bank of Hawkinsville shows that he was the agent of the Bank of Hawkinsville; and the testimony of A. M. Nisbet, the cashier of the Central Bank, proves that the money arising upon the discount of this paper, or one made by the same parties, in renewal of which the present paper was given, was paid to Scott Cray, as agent of the Bank of Hawkinsville. If this was given in renewal of a former paper, the proceeds, passed to the credit of the Bank of Hawkinsville, as the last endorser, could be drawn by its check only, and was applied to the payment of its liability on the former paper. Hence the proceeds, having gone to the credit of that bank, and applied as above, and the bank having had the benefit of the contract, it is liable, at any rate, on the common count. Such would have been the case if Cray had assumed to act as agent, but without legal authority.—*Epis. Charitable Society* vs. *Episcopal Church in Needham*, 1 *Pick. Rep*. 372; *Angell and Ames on Corp*. 2d ed., 178; 7 *Cranch*, 299, *Bank of Columbia* vs. *Paterson*; *Randall* vs. *Vanvetchen*, 19 *Johnson's Rep*. 60; *Story*, 298, 299. But in this case the agent had the most ample author-

422      SUPREME COURT OF GEORGIA,

The Merchants' Bank of Macon *vs.* The Central Bank of Georgia.

ity, and the objection is, that the name of the principal nowhere appears on the bill. The principal is liable, though his name does not appear on the instrument.—3 *Hill's R.* 72. I am aware it has been held, that the principal could not be bound at law, unless his name appeared on the face of the instrument, and that authority to this fact is to be found in *Chitty on Bills,* but the principal has always been held to be liable in equity, and also on the common counts. The doctrine on which these cases depend has undergone a very full consideration in the Court of Exchequer, in the case of *Higgins* vs. *Senior,* reported in 8 *Meeson and Welsby,* 440, and it was decided that though the principal was not named, parol evidence was admissible to charge him. The distinction seems to be, that parol evidence may be admitted to introduce a new party, but never to discharge an apparent party to the contract.—*Jones* vs. *Littledale,* 6 *Adolphus and Ellis,* 486.

This doctrine is maintained by Mr. Story, and cited by him with approbation.—*Story on Agency,* 190, 191, 334–5–6. This rule should be enforced, particularly in the case of notes and checks issued or endorsed by banks through their cashiers. These officers never sign the names of the corporations, whose agents they are. They uniformly sign their own names, and annex the character, "cashier." The checks usually, it is true, have on their face the name of the bank to which the cashier belongs.

It is, however, no part of the obligatory part of the check. The notes endorsed by cashiers frequently have no place of payment on their face. It would be ruinous if the banks were not liable, under such circumstances, on the contracts of their agent, executed under his official authority. This rule, in its rigor, for the benefit of commerce, is not held to apply to commercial transactions; and, indeed, may now be considered as confined to solemn instruments under seal.—*Townsend* vs. *Cornell,* 23 *Wendell,* 440,

The money arising from the discount of the bill of exchange, even if the bill and its endorsement had been contrary to law, having been paid to the Bank of Hawkinsville through its agent, the Merchants' Bank is liable, and the endorsement is proper evidence to charge it on the money counts.—*Utica Ins. Comp.* vs. *Kip,* 8 *Cowen's Rep.* 26 ; *Utica Ins. Comp.* vs. *Bloodgood,* 4 *Wendell,* 654.

The second ground of objection is, that the bill is not evidence against the defendant, because it is not signed by the president and countersigned or attested by the cashier, as is required by the 8th section of the charter of the Bank of Hawkinsville.

This section declares, that the funds of the corporation shall in no case be liable for any contract or engagement whatever, unless the same shall be signed by the president and countersigned or attested by the cashier of the corporation.—*Prince,* 108.

It is contended that, under this section, the bank is not liable for the act of its duly appointed agent. This act of incorporation, like all other laws, is subject to interpretation. And can it be so interpreted as to carry into effect the intention of the Legislature, protect the community, and secure the rights of the corporation ? It can. It never was the purpose or intent of the Legislature to enable banks to sell their cashiers' checks to immense amounts, free from responsibility for their eventual payment. It was not its purpose to exempt banks from liability upon their securi-

DECATUR, AUGUST TERM, 1846. 423

The Merchants' Bank of Macon vs. The Central Bank of Georgia.

ties, endorsed away by their cashiers. This construction has been given by the banks and the community to bank charters, and they have uniformly, except in cases of insolvency, promptly redeemed dishonored cashiers' checks and endorsements.

This provision is not peculiar to the Merchants' Bank of Macon.—See *charter of Bank of Augusta* sect. 33, *Prince* 54;

| | | | | | |
|---|---|---|---|---|---|
| Planter's Bank, | . | . | . | . | rule 12th, | *Prince* | 60 |
| State Bank, | . | . | . | . | " 11 | " | 65 |
| Bank of Darien, | . | . | . | . | " 11 | " | 69 |
| Bank of Columbus, | . | . | . | . | " 11 | " | 86 |
| Farmers' Bank of Chattahoochee, | | | | " 11 | " | 93 |
| Mechanics' Bank of Augusta, | . | . | " 11 | " | 96 |
| Commercial Bank at Macon, | . | | " 11 | " | 101 |
| Insurance Bank of Columbus, | . | . | " 7 | " | 105 |
| Bank of Milledgeville, | . | . | . | sect. 9 | " | 111 |
| Ocmulgee Bank, | . | . | . | . | rule 9 | " | 122 |
| Planters' and Mechanics' of Columbus, | | sect. 8 | " | 127 |
| Western Bank, | . | . | . | . | " 12 | " | 130 |
| Bank of St. Mary's, | . | . | . | " 10 | " | 135 |

Hence, it will be seen, that all the principal bank charters of the State of Georgia have the identical provision which the Merchants' Bank of Macon sets up as a bar to the recovery of a just debt.

The appointment of a cashier vests him with authority to do everything which is incident to his office ; or, in other words, with all the *ex officio* powers of such an officer, in as full and ample a manner as if he were invested by written power, or resolution of the board, with such powers.

The cashier of a bank is, *virtute officii*, intrusted with the notes, securities and other funds of the bank, and is held out to the world as the general agent of the bank, in the management, negotiation, and disposal of them. *Prima facie*, therefore, he must be deemed to have authority to transfer and endorse negotiable securities held by the bank, for its use and in its behalf.—3 *Mason's C. C. Reports*, 506. In the case here decided, *Wild* vs. *The Bank of Passamaquoddy*, the bank was held liable on the cashier's endorsement. The banks of this State have never construed their charters otherwise. The true construction of this act, then, I contend, excludes from the operation of the clause relied on, all checks drawn and endorsements made by the cashier under his *ex officio* authority, and the prohibitory part of the section, which it will be remarked is introduced by the way of *proviso*, applies only to such contracts as are not necessarily connected with the exclusive duties of the cashier.

I am an advocate for construing acts of the General Assembly according to the words used in the act, as most likely indicating the intention of the Legislature, unless absurd and grossly mischievous and unjust consequences will follow, which demonstrate that the letter of the statute embraces cases not included within the purpose and intent of the act: then, I am equally an advocate for a departure from a strictly literal construction.

This departure is authorized.—*The People* vs. *Utica In. Co.* 15 *Johns. Rep.* 380. By no other construction, can the rights of all parties be protected. By this construction, they can be preserved.

The cashier, for the faithful execution of the duties which belong to his office, and for his general fidelity, gives a bond, with security to the bank. ·This does not inure to the benefit of the community, but it effectually guards the bank against loss by the misconduct of its officer. The cashiers of our banks are daily checking and endorsing .in their own names, as cashiers, without the signature of the president; and this with the knowledge of the president, directors and company of the banks.

The public give faith to these, at least apparently, authoritative acts, and ·deal with them ; and the corporations permit their officers thus to deal, and approve their acts by passing their accounts.

Again : give the clause the interpretation for which plaintiff in error contends, and·there would be no responsibility on any implied undertaking; for the literal construction of the terms, " any contract or engagement *whatever,*" would apply as well to implied, as express contracts or engagements. An implied contract or engagement is some contract or engagement. The bank then would not be liable for deposites, for overpayments, for mistakes, or even for money awarded by the directors to customers on notes discounted. For these are all contracts or engagements of some kind. But in the case under consideration, the endorsement is made by an officer appointed by resolution of the board of directors, with most extraordinary powers—not only such as are ordinarily exercised by a cashier, but by cashier and board of directors jointly. He is authorized to *draw* and discount *bills of exchange.* To draw a bill of exchange, and to discount it when drawn, or, in other words, to have it discounted, is an authority which was doubtless given to enable the agent at Macon to borrow money to relieve itself in its days of great embarrassment, and this power was unquestionably exercised by the agent and for the objects contemplated by his constituent, when he borrowed the money from the Central Bank, on his endorsement. Power to discount includes the power to endorse.— *Story on Agency,*·73. He was vested with authority to discount as well as to draw. But the ground of error is, that the endorsement was not signed by the president and countersigned by the cashier. It was admissible under the money count, if not under the special count, (*Mechanics' Bank* vs. *The Bank of Columbia,* 5 *Wheaton,* 334,) and that, though it was illegal.—8 *Cowen,* 25 ; 4 *Wend.* 624.

3d. The third ground of objection is, that Scott Cray, the agent, exceeded all the powers conferred, and all the powers of a general agent, by endorsing this paper ; the counsel. contending, that it does not appear from the evidence that the bill of exchange ever had been the property of the plaintiff in error.

It is wholly immaterial whether the paper ever had been the property of the plaintiff in error or not. Its agent endorsed it and drew the money on it, and, it is to be inferred, offered it for discount. But if the question of property were material, it was a question of fact, and not of law, and it was proper, from the facts testified to by the cashier of the Central Bank, that the paper should have been submitted to the jury. If the jury found, contrary to law, on this point, or contrary to evidence, the party ought to have moved for a new trial.

4th. The fourth ground is, that the bill of exchange was issued in violation of the post-note law, and is therefore not recoverable.

The 1st section of the act of 1837, (*Pamphlet*, 191,) prohibits the issuing or passing, &c. any bank-bill, note, check, draft, receipt, instrument under seal, or any chose in action, intended, designed or fitted for circulation, instead or in character of either, which shall be payable at a greater length of time than three days after the date.

The 2d section is pretty much in the same terms, with the difference that, instead of prohibiting the payment after date, it prohibits the issuing paper, payable in anything but gold or silver at the standard value.

The 4th section expressly declares that it shall not apply to bills or checks issued for the ordinary purpose of exchange.

5th. The fifth ground of exception is, that plaintiff has proven no demand of payment of drawee, and notice of protest. The action is in favor of the Central Bank of Georgia, whose charter declares, that all suits commenced by said corporation, upon any note, bill, bond, obligation, upon which there shall be any endorser or endorsers, &c. &c. ; and no proof of notice, demand or protest, shall be required on any trial, to authorize a recovery, (sec. 26.)—*Prince*, 75. Section 20, which has been considered as applying to notes payable at the bank, but which, I question not, applies, or was intended to apply, to all papers, contains the same provision, and manifests the strong desire of the Legislature to hold the parties liable at all events. The capital of the bank having been constituted of the funds of the State, and the bank being entitled to the custody of the revenue of the State, were motives with the Legislature to guard effectually its funds against the frauds, negligence or omissions of its officers. But to enforce the law, there is no occasion to look out for motives for its enactment. *Ita lex scripta est*, is all sufficient—and the law is written that, in suits by the Central Bank of Georgia, no proof of demand, notice, or protest shall be required.

This bill of exchange which is the subject of the present suit, was discounted under the 4th section of the act of 1838, (*Pamphlet*, 46,) which only confers authority on the directors to discount, without respect to the limitation in the 25th section of the charter. This enlargement of the authority of the directors, does not repeal the provision in the act, of which this last is amendatory, which dispenses with proof of notice, demand and protest. There is no repugnancy, and without it there can be no repeal by implication.—9 *Cowen*, 507 ; 5 *Hill*, 225, 226. But arguments *ab inconvenienti* are resorted to, for the purpose of escaping from the operation of this section, in this particular case. 1st. That this paper does not bear date at the Central Bank, and is not payable there, and it would be a hardship on the endorser to hold him liable when he could not have known it was intended for discount at that bank. 2d. That to give effect to the statute, a bill of exchange, or other paper, held by other banks, might be transferred to the Central Bank, after the endorser had been discharged by the *laches* of the holder, in not giving the notice. Arguments *ab inconvenienti* are never admissible in resisting the operation of a statute. They are always good in opposing its enactment or advocating its repeal. But although the judiciary may not accord with the Legislature in the expediency of a law, it is nevertheless bound to enforce it, pro-

vided it be constitutional. "If parliament will positively enact a thing to be done which is unreasonable, I know of no power," says Blackstone, "in the ordinary forms of the constitution, that is vested with authority to control it."—1 *Com.* 91. But instances occur, in which particular cases are embraced by the letter of a statute, which happen to be unreasonable; and the judiciary will then presume that such case was not foreseen by the Legislature, and will exclude it from its operation.—1 *Com.* 91. This is giving what is termed an equitable construction to a statute. But before this can be done, the case must be considered as not embraced within the intent of the Legislature; for, to construe a statute equitably, is to give effect to the supposed intention, instead of the words, of the Legislature; but this is never done except where an adherence to the letter would be palpably unreasonable; for it is to be presumed always, that the Legislature have selected such words as are proper to express their meaning. Banks may purchase paper not payable at bank.—*Prince*, 462. Then to the first branch of the argument in this case: The Central Bank had authority to discount bills of exchange or other paper.— *Prince*, 73, sec. xi. of the charter. *Pamphlet*, 1838, p. 46, sec. xx, applies in the first part to notes payable at the bank. Sec. xxvi. applies to notes, bills, bonds, and obligations. Bills, of course, are never payable at the bank at which they are discounted. In the forms given in the books, the bank or the house of the banker at which they are discounted is never put down. Nothing more than the city or town at which they are drawn. The bill of exchange declared on, corresponds with these forms. The town or residence of the drawers, and also the town at which they are payable, are given. In this respect, also, the bill sued on corresponds with the form. Then the bill sued on is in the usual form, and of course the bank, having authority to discount or purchase bills of exchange, had a right to discount or purchase such as were offered, drawn in the usual form. When a person, then, draws or endorses a bill of exchange in the usual form, he does it with the law, a public law, before him, declaring that there are institutions in the State at which it may be discounted, and from which he would not be entitled to notice. When it is offered at one of these institutions, it is presumed that it was drawn for discount there. This is a presumption of law, on the universally recognized principle, that every man is to be presumed to have acted fairly and in good faith. The party draws or endorses with the knowledge, then, that he may be held liable without notice. It is possible he might protect himself by a memorandum on the face, or otherwise, that it was drawn for discount at a bank from which he would be entitled to notice. This he could easily do. But if he puts his name on a paper, without such a restriction, it is an offer to the world and to any institution to be held liable according to the law or usage which governs it. Notice of the usage of a bank, inconsistent with the law-merchant, will bind an endorser.—*Renner vs. the Bank of Columbia*, 9 *Wheaton*, 584. If the knowledge of such a usage will bind the party, much more will a public law, which all are bound to know. But, so far as this paper is concerned, the plaintiff in error knew it was for discount in the Central Bank; for it was in renewal of one which had been discounted by that bank, and protested; and this was notice enough to bind it by the law of that bank.—9 *Wheaton*, 584. But, suppose it was

drawn in the usual form, with the express understanding between the parties themselves that it was not to be discounted at the Central Bank, this private arrangement could not affect the bank or the public.

An equitable construction of the charter cannot aid the endorser, for by an equitable construction, the intention of the law-maker is to be enforced, even against the letter. But the letter and the intent go together in the charter ; for the intent is, that the bank shall lose nothing, and none of its remedies, in any class of paper it is authorized to purchase or discount, by want of notice, demand or protest ; and the expression is broad enough to embrace this case. The act has declared, that no proof of notice, demand or protest shall be required on any trial, and the act expresses the object and intent of the Legislature.

Again : this paper was discounted for the benefit of the plaintiff in error, and the proceeds were paid to it, and the plaintiff in error was the endorser, and it is not entitled to notice.—*French* vs. *the Bank of Columbia*, 4 *Cranch*, 161 ; *Agan* vs. *M'Manus*, 11 *John. Rep.* 181.

It may be laid down as a rule, that where the drawer has no funds in the hands of the drawee, and he or the endorser have reason to believe that the bill will not be honored, notice is unnecessary. In this case, acceptance was waived, of course, at the instance of the drawer or endorser, and which furnishes evidence that there were no effects in the hands of the drawee. Previous bills drawn and endorsed as this, and in renewal of which this was given, had been returned unpaid, which affords still stronger evidence that there were no effects in the hands of the drawee, and under these circumstances notice was unnecessary.—4 *Cranch*, 154.

If, at the time the bill was drawn, the drawer had no reason to expect that his bill would be paid, notice was unnecessary.—4 *Cranch*, 157 ; *Hopkirk* vs. *Page*, 2 *Brock. C. C. Rep.* 28.

A party drawing without funds, property, or authority, puts the transaction out of the pale of commercial usage and law, and he is not, in such case, entitled to notice.—*Dickens* vs. *Beal*, 10 *Peters*, 578.

It is contended, that the effect of enforcing this act will be, to place it in the power of the Central Bank to purchase up dishonored paper from other institutions, whose duty it is to give notice to endorsers and drawers to charge them, and, in this manner, to hold them liable after they had been discharged. This argument is drawn from the presumption, in the first place, that the officers would commit a breach of duty ; which is inadmissible, and contrary to the rule, that an officer is to be presumed to execute his office until the contrary appears.

It is true, that such a case is not embraced within the intent and meaning of the act, and the defendant could not be held liable. But, because a party in such a case would not be liable, it affords no reason for setting aside the act. He would be presumptively liable. The suit being brought by the Central Bank, on the maxim that " *omnia præsumuntur rite acta*," it would be presumed that the note or bill was negotiated at the Central Bank before due, and that it was taken at the bank, in the usual course of business at that bank. If it was not, it would be a matter of defence.

The same presumptions would exist in favor of the Central Bank, in such case, that would in favor of an individual who had purchased a note over due, not payable at bank but negotiated to a bank, but

on which the bank had lost its remedies against the endorsers, by a failure to give the notice. · The plaintiff would not be required to prove that the note had not been negotiated at bank, as an excuse for not giving the notice.

He would be presumed to be the holder in a fair course of trade. But this presumption could be rebutted by the defendant, by proof of his discharge for the want of notice, the note having been negotiated to, or deposited in, a bank.

In this case, there is no averment of notice of protest, or non-payment, and such proof was not required by the pleading. The party did not demur to the declaration, or. move in arrest of judgment, and there is no exception on that account.

The sixth, and last ground of error complained of, is, that the court refused to rule that the original protest must be produced or accounted for. The court reiterated its former decision, that no notice or protest was necessary; and the authorities and arguments adduced, on the last point, are referred to, as sustaining the court on this, with this addition: that, in a suit in favor of the Central Bank, a notice or protest is no more necessary, in case of a foreign bill of exchange, than is required on an inland bill. In Georgia, a bill drawn in one State on another is an inland bill, and a protest is only necessary where the five per cent. damages are claimed.—*Prince* 454. As to foreign bills, see *Prince* 462. The charter of the bank declares, that no notice of protest shall be required. This provision must have been made in reference to bills between different States, or foreign bills, for in no other case is a protest or notice of it necessary. The bill is admissible under the common counts.—*Chitty on Bills,* 594.

R. V. HARDEMAN, in conclusion, for the plaintiff in error.

*By the Court*—NISBET, Judge.

There are two counts in the plaintiff's writ : one founded on the bill of exchange, the other for money had and received. The testimony proves that the bill was discounted by the Central Bank, at the instance of Scott Cray, for the Bank of Hawkinsville ; that the money was paid to him, and deposited in the agency of the Hawkinsville Bank at Macon, to the credit of Jerry Cowles, the drawer ; and that two-thirds of it was applied in extinguishment of a debt due by him to the Hawkinsville Bank ; the balance, Mr. Cowles was permitted to check out. Under this state of facts, if it is conceded that the Merchants' Bank of Macon is not liable to pay this bill, upon the endorsement of Scott Cray, yet it is, in our opinion, liable upon the common count, upon principles *ex æquo et bono.*

If a person, assuming to act as the agent of a corporation, but without legal authority, makes a contract, and the corporation receive the benefit of it, and use the property acquired under it, such acts will ratify the contract, and render the corporation liable thereon.—*Angell andAmes,* 2d edit. 178 ; 8 *Cowen,* 25 ; *Story on Agency,* sect. 162 ; 1 *Pick'g,* 372 ; 7 *Cranch,* 299 ; 19 *Johns. R.* 60 ; 4 *Wend.* 624 ; 5 *Wheat.* 334. It is contended by the plaintiff in error, that an act of

an agent, to be binding upon his principal, must be done in the name of the principal; and, inasmuch as the name of the principal does nowhere appear on this bill, it cannot be evidence to charge the principal, the Merchants' Bank of Macon, formerly the Bank of Hawkinsville. The bill is payable to the order of Scott Cray, agent; drawn by J. Cowles, upon the cashier of the Fulton Bank, New York; acceptance waived, and endorsed " Scott Cray, agent."

The inference drawn from the paper is, that Scott Cray acted as agent for some person, or corporation, but who, or what, does not appear. The name of his principal does not appear. The general rule is this: in order to bind a principal, on a contract made by an agent, it must purport, on its face, to be the contract of the principal; and his name must be inserted in it, and signed to it. It is not enough, that the agent be described as such in the instrument.—*Story on Agency*, sect. 147; *Paley on Agency by Lloyd*, 180, 181, 182; *2 Kent*, 629, 3d edition.

This rule applies, more particularly, to solemn instruments under seal; and as to them, to use the language of Judge Story, it is " regularly true," but not universally true in all its extent. For, so far as regards instruments under seal, there are some exceptions to some of the requirements of the rule. Although the rule is thus strict as to sealed instruments, yet a more liberal rule obtains as to unsolemn instruments, especially commercial and maritime contracts. In such cases, in furtherance of the public policy of encouraging trade, if it can, upon the whole instrument, be collected, that the true object and intent of it are, to bind the principal, and not merely the agent, courts of justice will adopt that construction of it, however informally it may be expressed.—*Story on Agency*, sect. 154. This is a commercial contract, not under seal, and comes under the rule last laid down. If an agent, in a parol contract, intends to bind his principal, and *appears to act as agent*, the principal is bound.—*Wheaton's Selwyn*, 823, note 5, Am. ed.; *2 Fairfield*, 267; *8 Pick.* 56; *Angell and Ames*, 235–6–7.

It may be stated generally, that where it appears from the face of the paper, that the credit is not given to the agent, and the name of principal is disclosed at the time of the transaction, and the act is within the powers of the agent, the principal is bound. The question whether the agent is bound, does not affect this question, for there are many cases where both principal and agent are bound. Now, it is apparent on this bill of exchange, that it was the intent of the parties to bind Scott Cray's principal: else why make it payable to him as agent, and why take his endorsement as agent? It is still more manifest that he does appear to act as agent. The testimony upon the trial, too, is, that the name of his principal was disclosed to the Central Bank at the time the bill was discounted. We hold, too, that upon parol contracts, where the intent is not sufficiently clear that the principal is to be bound, the defect can be supplied by parol testimony. A party cannot be discharged, who is apparently liable on the contract, but a new party may be introduced by parol.—*Ang. and Ames*, 236–7; *5 Wheat.* 326; *1 Cowen*, 536; *12 Mass. R.* 240; *1 Cranch*, 345; *6 Adolphus and Ellis*, 486; *8 Meeson and Welsby*, (*Excheq.*) 440. See, also, *Story on Agency*, 190, 191, 334–5–6.

430　　　　SUPREME COURT OF GEORGIA,

The Merchants' Bank of Macon *vs.* The Central Bank of Georgia.

The testimony on the trial shows that it was the intent of the parties to bind the Bank of Hawkinsville by this endorsement.

The second assignment of error is, that this bill of exchange is not evidence against the defendant, because it is not signed by the president and countersigned by the cashier, as is required by the 8th section of the charter of the Bank of Hawkinsville. That section declares, that the funds of the company shall, in no case, be liable for any contract or engagement whatever, unless the same shall be signed by the president and countersigned by the cashier of the corporation. —*Prin.* 108. This provision is found in most of the bank charters of this State, and if construed to apply to bills of exchange, checks, and drafts, as well as to all the contracts or engagements of the banks implied in law, then there will be introduced an entire change in the manner of doing bank business in Georgia. Indeed, then it would be hardly possible to bank at all. There is nothing in the form of a contract, expressed or implied, that is not comprehended in the sweeping phraseology of this section. Neither the banks themselves, nor the courts, nor the mercantile community, have held it to apply to the ordinary business contracts of the corporation. Upon the interpretation contended for by the plaintiff in error, no bank would be liable for its deposits ; nor upon any of that large class of engagements which, in mercantile affairs, result by implication or operation of law. This is not all ; credit, which is based upon character, upon good faith, upon honor, and which constitutes the soul of commerce, would be no longer an element in banking.

For this would be substituted, in all cases, when practicable, the president's signature and the cashier's certificate. Who would deal with a bank which, in bar of its cashier's checks, drafts, or endorsements, could successfully plead the absence of its president's signature ? What company, with honest purposes, would accept a charter, if the franchises conferred were to be enjoyed solely upon the condition that no engagement, of any kind, could be entered into but in writing thus formally authenticated. If it be a privilege to a bank, to be bound only by contracts in writing, signed by its president and countersigned by its cashier, then common honesty, as well as her interests, would compel her to make no other. The privilege contended for by the plaintiff in error, would work an estoppel to banking in Georgia. Thus we arrive at the conclusion, that the Legislature did not intend, in these comprehensive words, to defeat the very objects contemplated in this charter. The whole act must be construed together ; all parts of the charter must stand, if possible, and the different parts must be made to harmonize. We cannot suppose that the Legislature intended to confer banking privileges, and in the very act which confers them, insert a clause which, in the form of guardianship, or protection, practically annuls the charter.

In the judgment of this court, the clause of the charter does not apply to such contracts or engagements as occur in, or are necessary to, the ordinary business of a cashier or agent (*Ang. and Ames*, 231-2 ; 5 *Wheaton*, 326) ; such as drawing or endorsing bills of exchange, checks, and drafts. These acts appertain, according to commercial law and usage, to the office of a cashier. The record discloses that

Mr. Cray was the general agent of the Bank of Hawkinsville, at Macon. He possessed, as such, more than the power which ordinarily belongs to a cashier. He had charge of the agency of the bank at Macon, *virtute officii*; therefore, he was clothed with all the powers of a branch of the Bank of Hawkinsville. Among those powers, certainly, is the power to discount bills of exchange (*Angell and Ames*, 243-4-5) ; to deal in bills, was no doubt the prime object of creating an agency at Macon. He was held out to the public as the general agent of the Bank of Hawkinsville, at Macon ; and being so held out, the bank was bound by all his acts, done within the scope of that agency, even although restricted, as to certain acts, by secret instructions. There is no doctrine better settled than this. It is the doctrine of the Roman, as well as the commercial law.—See 12 *Wheaton*, 70 ; 1 *Harris and Gill*, 392 ; 3 *Mason*, 505 ; 21 *Wend*. 296 ; *Ang. and Ames*, 222, 234, 238 ; *Story on Agency*, sec. 126-7-8. Also, we hold that, in the absence of any express power to draw and discount and endorse bills of exchange, that the Bank of Hawkinsville was liable upon this endorsement, according to the principles just stated ; but if this were not so, it is liable, because the order of the board of directors expressly clothes Mr. Cray with power to *draw* and *discount* bills of exchange. The power to *discount* confers the power to *endorse*. Wherever an agent is empowered to do a particular thing, he is also empowered to use the means necessary to accomplish it. The means are included in the power.—*Story on Agency*, sec. 77. A power to discount bills includes a power to endorse.—*Story on Agency*, sec. 59 ; *Bayley on Bills*, 5th ed. chap. 2, 7. In the *Mechanics' Bank of Alexandria* vs. *the Bank of Columbia*, reported in 5 *Wheaton*, 326, there is a construction put upon the 8th section of the charter of the Bank of Hawkinsville, by the Supreme Court of the United States— we say a construction put upon this section, because that case arose under the provision of a bank charter almost identical with it. The provisions of the two charters are in all material particulars the same. The words of the charter of the Mechanics' Bank of Alexandria are : " All bills, bonds, notes, and every other contract or engagement on behalf of the corporation, shall be signed by the president and countersigned by the cashier, and the funds of the corporation shall in no case be liable for any contract or engagement, unless the same shall be so signed and countersigned as aforesaid." By comparing this section with the provisions of the charter of the Hawkinsville Bank, hereinbefore recited, their substantial identity will be seen. The Supreme Court, in this case, determined that the clause of the charter of the Mechanics' Bank of Alexandria did not apply to a check drawn by its cashier, or to contracts implied in law.

The third ground of error is, that Scott Cray exceeded all the powers conferred upon him specially, and also all the powers of a general agent, in endorsing this bill, because it does not appear from the evidence, that the bill had ever been the property of the plaintiff in error.

The bill being made payable to the agent of the plaintiff in error, and in the hands of his immediate endorsee, the only fair inference is, that it was discounted at the instance of the plaintiff in error ; and if presented by the plaintiff in error for discount, it is equally clear that he was the owner. Ownership may be inferred, too, from the fact of

endorsement. The bill itself affords evidence enough of ownership, to cast upon the defendant, in the court below, the burden of disproving it. The testimony, however, as to the ownership, is not confined to the bill itself. It is in evidence, by parol, that Mr. Cray went to Milledge-ville by direction of the president of the bank, for the purpose of pro-curing a discount from the Central Bank, and that while there, under an arrangement with Mr. Cowles, the drawer, this bill was put into his hands to be discounted at the Central Bank—that it was presented by him, discounted, and the money paid to Mr. Cray. The ownership of the bill was a fact for the jury to determine upon the evidence sub-mitted to them; they have passed upon it, and it is not the business of this court to disturb their finding.

The fourth ground of error was abandoned by the counsel for the plaintiff in error.

The fifth ground of error is, that the plaintiff did not prove demand of the drawee and notice to the endorser, and therefore they were not entitled to recover.

Bearing in mind the circumstances under which this bill was dis-counted at the Central Bank, it will also be remembered that the action upon it was brought by the Central Bank against the Merchants' Bank of Macon; who had by endorsement negotiated it to the plaintiff. It is contended by counsel for the defendant in error that, by the charter of the Central Bank, demand and notice was not necessary; and in this opinion of the learned counsel, this court coincides. The 20th section of the charter of the Central Bank declares: "The directors of said bank shall not require town endorsers upon any note or obligation made payable at said bank, when the country endorsers are deemed amply responsible to secure the payment of the same, and no notice or protest shall be necessary to charge any endorser, nor shall any charge be made by any notary public, for noting for nonpayment, or protesting any note due at said bank."—*Prin. Dig.* 74. This section, by its terms, is claimed, and we think rightly, to apply only to notes and obligations made payable at the Central Bank. Section 26th of the charter pro-vides, that in "all suits commenced by said corporation upon any note, bill, bond or obligation, upon which there shall be any endorser or en-dorsers, the maker or makers, together with the endorser or endorsers, or their representatives, may be embraced and sued in the same action, and no proof of notice, demand, or protest, shall be required on any trial, to authorize a recovery." These sections repeal the *law-mer-chant*, requiring demand and notice to charge endorsers, in all the cases contemplated by them. This is so, or language has no meaning. The Central Bank is founded on the public funds; it is the financial agent of the State; and with a view to the greater security of those funds, and to the greater facility of collecting the debts due it, and the conse-quent increased efficiency of the institution as a fiscal agent, these pre-liminary steps to charge endorsers were dispensed with. One of the objects of the organization of the Central Bank, was relief to the peo-ple by accommodation loans; in consideration of which, it was no doubt thought but reasonable to withhold the right to notice which the law gave to endorsers. Be these things as they may, it was clearly the right of the State, in organizing a banking institution upon her own

funds, to prescribe the conditions upon which the public should deal with that institution. These conditions are embodied in the charter, and are made known to the world. Without feeling under obligation to give a good reason for all the laws of the State, we do feel it to be the paramount duty of this court to enforce them, if they are constitutional. Now, whosoever takes the privileges of this institution, takes them *cum onere;* and one of the burdens which he assumes is, to give an endorser or endorsers, who shall be liable without notice. Nor is it incumbent upon us to demonstrate the convenience of the law, when there is no doubt in our minds as to what the law is; it is sufficient for us to say, " *Ita lex scripta est.*" We do not deny that arguments " *ab inconvenienti* " are legitimate aids to construction, in cases where the meaning and intent of the law is doubtful, and where other approved rules of construction have failed sufficiently to elucidate it. In the present case, we cannot say that we have a reasonable doubt about the meaning of the two sections under review. The limitation in the 20th section, which confines its operation to notes or obligations made payable at the Central Bank, is not found in the 26th. That enacts, that in all suits, commenced by the corporation upon any note, bill, bond, or obligation, the maker may be joined in the action with the endorser or endorsers, or their representatives; and it farther declares, that no proof of demand, notice or protest shall be required in any trial to authorize a recovery. Now this was *a trial* of an action *on a bill;* upon which, the charter declares, no proof of notice, demand or protest shall be necessary to authorize a recovery. In the teeth of this very plain provision, the plaintiff in error contends that proof of demand and notice was *necessary* to authorize a recovery. The counsel for the plaintiff in error, in his able argument, insisted that the 26th section applied only to cases where the maker and endorsers are sued in the same action; that is, inasmuch as the section permits a joinder of these parties in the first division, therefore, the distinct enactment in the second division is limited in its application to trials where there is such joinder. We think this is a *non sequitur,* and that the latter division is as general as it would be if it stood alone in the charter.

There is in fact no necessary connection between the two divisions. The language used is, no proof of demand, notice or protest should be necessary in *any trial,* neither on a trial of a joint action or *any other.* All trials, and therefore this, are embraced in the general language of the act.

By the 25th section, the amount of loans to any one person, or body corporate, or society, or collection of persons, is restricted to $2,500. In 1838, the Legislature authorized the bank, for the purpose of remitting money to pay the interest on the State debt, to purchase exchange beyond the amount of $2,500, to which their loans were limited by the charter. This bill was discounted under the act of 1838. It is contended, then, farther by the counsel for the plaintiff in error, that this debt was not contracted under the charter; but being contracted under a law of the Legislature, the general law as to notice, and not the charter, governs the contract, and, if so, the notice was necessary. The law of 1838 is a repeal of the charter, so far as it limits the amount authorized to be loaned to any one person, and permits the bank to purchase exchange in

sums greater than $2,500. To this extent it repeals the charter, and no farther. It does not repeal that provision of the charter which dispenses with proof of demand, and notice and protest. Nor is the act of 1838 in conflict with that provision; if it were, it would be repealed by implication. It is said that this bill is not made payable at the Central Bank, and therefore is not subject to the provision of the charter dispensing with demand and notice. The answer to this idea is, that the 26th section applies to all bills, bonds and notes and obligations, whether payable at the bank or not. Again: it is contended that, inasmuch as this bill is not payable at the Central Bank, the endorser could have no means of knowing that it would be discounted there; but must needs infer that it would be subject to the general law of the land, and *therefore* it ought not to be brought within the provisions of the charter, as to demand and notice. This reasoning amounts to this, that the charter itself is a fraud upon an endorser so situated. But how can this be so? This bill is payable at ninety days, and is drawn upon a bank in New York: the endorsement was a voluntary act. It was liable to be negotiated at any bank in the State, and as well at the Central Bank as anywhere else—the charter of that bank, as well as the act of 1828, authorizing it to deal in exchange. All the provisions of that charter are presumed to be known to the endorser. The Bank of Hawkinsville was presumed to know that the Central Bank could discount this bill; and, if it did, it was exempted from the usual necessity of demand and notice; for the charter, being a public law, is notice to the world of all its provisions. The endorsement was made therefore at the risk of the paper falling into the hands of the Central Bank: it was made subject to that form of liability which the law creates in that event. It is quite immaterial what may have been the expectations or understanding between the drawer and endorser, as to the destination of this bill, unless the Central Bank was a party to them; for in that event only would it be bound by them. · But the facts of this case preclude the application to it of the reasoning which we have endeavored to silence. This bill was presented by the endorser at the board of the Central Bank for discount; it was discounted for the benefit of the Bank of Hawkinsville; the money raised upon it was in fact paid to the endorser. It (the Bank of Hawkinsville) became voluntarily a dealer with the Central Bank, with notice of the fact that demand and notice was not by her charter necessary to charge the endorser. It endorsed the bill to the Central Bank. It therefore made with the Central Bank a contract, into which that provision of the charter which dispenses with notice entered. The Bank of Hawkinsville is estopped. It cannot, in the face of its own contract to the contrary, claim the benefit of want of notice.

A party dealing with a bank, with knowledge of its usage in contravention of the general commercial law, will be bound by the usage.—9 *Wheat.* 584. With stronger reason will a party be bound by the charter of a bank, whose provisions are in conflict with the usual rules of commercial law. An argument, *ab inconvenienti*, against the construction of the charter for which we contend, is drawn from the power which such a construction would give to the Central Bank to charge an endorser, in cases where he is discharged by want of notice. Thus, the holder of an endorsed paper fails to give notice, and the endorser is discharged; he

paper is then transferred to the Central Bank, which, under its charter, notwithstanding, collects the money out of the endorser. Such a case would not come within the 26th section; not because it would not be embraced in its terms, but because the rights of the endorser being fixed by the law regulating his contract, the subsequent ownership of the paper by the Central Bank could not divest those rights. The Central Bank would buy the paper, subject to the law, which, up to the time of her becoming the holder, governed it. She would become the transferree of a paper upon which the endorser is discharged, and would acquire no more rights against him than if his name had never been on it. Would she, then, in such a case, be required to show notice or be nonsuit? Certainly not. She is relieved by the charter from the obligation to prove notice, upon all trials. But, she being the holder of a paper transferred after due, the defendant is let into his defence. That defence is, that before the bank became the owner of the note or bill sued on, he was discharged for want of notice. We have no doubt but that the defence would be triumphant; and thus the general law, regulating the rights of endorsers and the special provisions of the charter, would harmonize. Whether this be considered an inland or foreign bill, we do not find it necessary to decide, as we believe the bank charter dispenses with notice in either case.

Nor do we deem it necessary to express any opinion as to what would be the rule, according to the law-merchant, upon the sixth and last ground of error, to wit: that the protest itself, being the highest and best evidence, the court erred in admitting the evidence of the notary.

The charter is very explicit; no proof of demand, notice, or *protest,* is necessary in any trial to a recovery.

Let the judgment of the court below be affirmed.