# AUGUSTA & SUMMERVILLE RAILROAD COMPANY *v.* CITY COUNCIL OF AUGUSTA

## *et al.* (Three cases.)

1. Where a railroad company was incorporated by an act of the General Assembly "for the full term of thirty years," the act being silent as to any renewal or extension of the charter thereby granted, and it being declared therein that the company was incorporated for the purpose of building and using, with the consent of the city council of a named city, a horse railroad from a designated point within the corporate limits to a point or points outside of the same, a grant by the city council to the company, "their successors and assigns, for and during the term of their charter," of a right of way through and over the streets of the city, expired on the date upon which the period of thirty years specified in the charter ended, and was thereafter no longer effective.

2. The above is true although such grant was made by ordinances and by a written contract, all of which were subsequently ratified and confirmed by an act of the General Assembly, which also declared that these ordinances and this contract were "not liable to be repealed by the city council," and although in the contract the city council stipulated that it would "forever"

keep in force the second section of one of these ordinances, which, while entitled generally "an ordinance authorizing the construction of street railways" in the city in question, related exclusively to this particular company, the second section referred to among other things providing that "the cars and carriages of said company, running on said railways, turnouts and switches, and sidings, shall be entitled to the right of way over their said tracks," and prohibiting teams and vehicles from obstructing the free passage of the company's cars.

3. Where such a railroad company, in pursuance of an ordinance authorizing it to obtain from another railroad company "a lease for thirty years" of a track which had already been laid in certain streets, entered into a contract with the latter company by the terms of which the company first referred to was to have the use of that track "for the term of their charter," this contract likewise expired by limitation on the day when the period of thirty years mentioned in the charter of the lessee company was completed.

4. The time for the expiration of the original charter being the 20th day of March, 1896, and the General Assembly having, on the 13th day of November, 1889, passed an act to continue this charter in force upon certain conditions and with certain restrictions in the act set forth, the company's acceptance of this act made the same the company's charter, and thereafter its corporate powers, rights and privileges were to be measured and limited by the provisions of this latter act.

5. Although this act, among other things, declared that the company to which it referred might, "at any time, by a majority vote of the stockholders, surrender their present charter before the expiration thereof and accept this new charter, with all its privileges and liabilities," this was not the exclusive manner in which the company could accept the new charter. The same result could be, and in the present case was, accomplished by its applying to and obtaining from the city council, under and by virtue of this very act, valuable privileges and franchises which it actually used and enjoyed and subsequently sold to another corporation.

6. Having accepted the provisions of the act of 1889, which renewed and extended the charter life of the company for a period of fifty additional years, there was no authority of law for the company subsequently to apply to and obtain from the secretary of State an independent renewal of its charter under the act of December 20th, 1893, that act having no application save to corporations whose charters had expired, or were presently about to expire.

7. Inasmuch as the act of 1889 expressly declared that it should not "have the effect or be construed to extend or continue in force" the several amendments to the original charter of the company, which had been previously enacted, or the ordinances and contract above referred to; and also, that the right to use the streets of the city in question should be "subject to the consent of, and on such conditions as [might] be prescribed by, the city council," it was certainly, after March 20th, 1896, essential that the company should again obtain such consent before being entitled to continue its use of •the streets of the city for the purposes specified in its original charter.

8. The rule being that legislative grants of authority to municipal corporations must, where the rights of the public are concerned, be strictly construed, and that in such cases no power passes which is not clearly comprehended within the words of the statute or derived therefrom by necessary implication, an act authorizing a city council "to permit the connection by common depots, tracks, or otherwise, of all railroads in said city, or any of them, upon such terms and conditions as may be fixed and agreed on between the city council and them," did not give to the municipal authorities the power to confer upon any railroad company using steam motors the right to construct and operate a railway or railways longitudinally along and over the public streets of the city. The municipality could not, under the grant embraced in the words above quoted, confer upon a railway corporation any higher or greater privileges than it would have been entitled to if these words, or words of like import, had been contained in a direct grant from the General Assembly to the corporation itself.

Argued February 9-11,—Decided March 29, 1897.

Petition for injunction, etc. Before Judge Callaway. Richmond county. September 28, 1896.

*Frank H. Miller, Boykin Wright* and *William K. Miller*, for Augusta & Summerville Railroad Co.

*Joseph B. Cumming, Joseph Ganahl* and *Black & Verdery*, for Southern Railway Company and other parties.

*M. P. Carroll, J. R. Lamar* and *J. S. & W. T. Davidson*, for City Council of Augusta.

LUMPKIN, Presiding Justice.

The Augusta & Summerville Railroad Company was incorporated by an act of the General Assembly, approved

March 20th, 1866, "for the full term of thirty years."
The charter declared that the company was incorporated
for the purpose of building and using, with the consent of
the City Council of Augusta, a horse railroad from a desig-
nated point within the limits of the city to a point, or points,
outside of the same.    The city council, both by ordinances
and by a special contract in writing, granted to the com-
pany, "their successors and assigns, for and during the term.
of their charter," a right of way through and over the
streets of the city.    There is nothing in the charter with.
reference to any renewal or extension of the same beyond
the period of thirty years.    The ordinances and contract
above referred to were subsequently ratified and confirmed
by another act of the General Assembly, which, among
other things, declared that they were "not liable to be re-
pealed by the City Council" of Augusta.    One of these
ordinances purported generally to authorize the construc-
tion of street railways in Augusta, but an inspection of it
shows that it was intended to relate exclusively to this.
particular company.    The second section of this ordinance
provided that "the cars and carriages of this company, run-
ning on said railways, turnouts and switches and sidings
[viz: those the company had been authorized to construct],
shall be entitled to the right of way over their said tracks,"
and prohibited teams and vehicles from obstructing the
free passage of the company's cars.    In the special contract.
between the city and the company, it was stipulated that the
city would "forever" keep this section in force.

Prior to the year 1868, the South Carolina Railroad
Company was in possession of and using a railway track
which had been laid longitudinally in Washington street
in the city of Augusta, claiming the right to do so under
ordinances adopted by, and contracts made with, the city
council.    This track affords the only existing means by
which a connection between some of the railroads run-
ning into Augusta can be made with other railroads en-

tering the city, so as to facilitate the transaction of through business. On March 13th, 1868, the city council adopted an ordinance authorizing the Augusta & Summerville Railroad Company to obtain from the South Carolina Railroad Company "a lease for thirty years" of the track above mentioned; and, in pursuance of this ordinance, a contract was entered into between these two companies, by the terms of which the Augusta & Summerville Railroad Company was to have the use of that track "for the term of their charter." In 1869, the Columbia & Augusta Railroad Company, when nearing the completion of its road, petitioned the city council for leave to enter the city. An ordinance was adopted on April 27th of that year, re citing that if the street railroad tracks were sufficient, "then the said Columbia & Augusta Railroad must arrange with said street railroad company [meaning the Augusta & Summerville Railroad Company] for this purpose." This gave rise to a controversy between the South Carolina Railroad Company, on the one side, and the city council and the Columbia & Augusta Railroad Company, on the other, which was adjusted and settled by a tripartite agreement, by the terms of which the city council guaranteed to the two railroad companies "the free use in perpetuity of the track now on Washington street, in said city of Augusta, with steam or other power, at the option of each company." Subsequently, and in pursuance of the ordinance of April 27th, 1869, a contract was entered into between the Columbia & Augusta and the Augusta & Summerville Railroad Companies, under which the former gained the consent of the latter to use the Washington street track, the control of which the Augusta & Summerville Railroad Company claimed under its contract with the city council and the lease from the South Carolina Railroad Company. The South Carolina & Georgia Railroad Company and the Southern Railway Company, which are apparently the legal successors, respectively, of the South Carolina Rail-

road Company and the Columbia & Augusta Railroad Company, are parties to the present litigation, insisting that the ordinances and contracts of the city council, under and by virtue of which the use of the Washington street track for transferring cars propelled by steam locomotives was acquired by their predecessors, are valid, lawful and binding upon the city.

On November 13th, 1889, the General Assembly passed an act to continue in force the charter of the Augusta & Summerville Railroad Company. This act recited that the original act of incorporation would expire on the 20th day of March, 1896, and provided that it "be continued of force from and after the expiration thereof for the full term of fifty additional years, with all the powers and privileges given in said act not restricted hereby." Among the restrictions thus indicated, it was declared that "nothing in this act contained shall have the effect or be construed to extend or continue in force" the several acts amending the company's charter, which had been previously enacted, nor the several ordinances which the City Council of Augusta had adopted with reference to this company, nor the special contract between the council and the company; and also, that "this act is not intended, nor shall it be construed to extend to said corporation any exclusive rights or privileges to the use of the streets of the city of Augusta, but the right to use any and all of said streets shall be subject to the consent of and on such conditions as may be prescribed by the city council of Augusta." This act further declared that the company might, "at any time, by a majority vote of the stockholders, surrender their present charter before the expiration thereof and accept this new charter, with all its privileges and liabilities." There was never any direct action by the stockholders accepting the act of 1889 as the company's charter, but the company did formally apply to and obtain from the City Council of Augusta valuable privileges and franchises, the application reciting that it

was made under and by virtue of this act. Subsequently, the company sold out to another corporation its various lines of railway, its rolling-stock, equipments of all kinds, and its entire business as an active carrier. It retained, however, a nominal dominion over the track it had leased from the South Carolina Railroad Company, and, without running any trains or cars of its own thereon, derived a very large annual income therefrom by exacting tolls from the steam railroad companies. This the Augusta & Summerville Railroad Company continued to do until the day upon which its original charter expired. Before that day, it applied to and obtained from the secretary of State a certificate purporting to be a renewal of that charter and the various acts amending the same, save only the act of 1889, which was not mentioned in the application, the company assuming the position that it had never accepted the same and was in no way affected by its enactment.

Shortly before the 20th day of March, 1896, the Augusta & Summerville Railroad Company became aware that after that day the city council intended to treat its contract with that company and the various ordinances which had been adopted in its favor as to the use of the streets of the city as having expired by limitation, and that it was the purpose of the municipal authorities to assume in behalf of the city the position of toll-gatherers from the steam railroad companies. Accordingly, the Augusta & Summerville Railroad Company filed an equitable petition against the city council, alleging, in substance, that all the rights, privileges and franchises it had obtained from the city would remain of full force and unimpaired after the day mentioned, and praying that the city be enjoined from interfering therewith or carrying into effect its proposed scheme of substituting itself for the plaintiff as a gatherer of tribute from the steam railroad companies. These last, in their pleadings, coincided with the city in its defense to the petition, in so far as it sought to break up the monopoly which

had been so long enjoyed by the plaintiff, but they agreed
with the latter in the position that the city could not law-
fully make merchandise of the use of its streets for railroad
purposes, and claimed the right to continue running trains
and cars over the Washington street track under the grants
from the city mentioned above. The trial judge denied
the injunction prayed for by the plaintiff, but held that the
grants just referred to were void for want of sufficient
authority on the part of the city to make them; and thus,
by his judgment, left the city master of the situation.

1, 2, 3. The original contract between the city council
and the Augusta & Summerville Railroad Company and
the ordinances adopted in its favor did expire on March
20th, 1896. The company's charter was for thirty years.
The grants were "for and during the term of their charter."
Plainly this meant that the grants were not to extend beyond
the term of thirty years fixed by the charter. It makes no
difference that the General Assembly ratified and confirmed
this contract and these ordinances. This could not, and
did not, give them any more force than they had in and
of themselves. That they were declared "not liable to be
repealed by the city council," simply meant that the latter
could not cancel or annul its contracts as made. This decla-
ration was certainly not intended to give these contracts a
vitality they did not otherwise possess, or prolong the period
during which they should be effective. The use of the
word "forever" in that portion of the special contract
wherein the city undertook to keep in force an ordinance
securing to the company the use of its tracks and prohibit-
ing obstructions to the free passage of its cars, cannot be
given the significance claimed for it. In the light of all
the facts, it would be very unreasonable to hold that the
employment of this word in this connection must neces-
sarily operate to confer upon the company a grant in per-
petuam of exclusive and most valuable privileges, when
everything else which occurred shows that nothing of the

..sort was ever contemplated or intended. This view is
.strengthened by the fact that under one of the ordinances
.authorizing this company to obtain "a lease for thirty years"
from the South Carolina Railroad Company of the Wash-
.ington street track, it effected a lease good only "for the
term of [its] charter." We hold, without serious diffi-
culty, that the grants from the city and the lease just men-
·tioned expired when the period of thirty years provided
.for in the charter of the Augusta & Summerville Railroad
·Company was completed. We are not now called upon to
.discuss what would be the rights of such a company under
.a renewal of its charter, or how its stockholders who had
.expended money in constructing tracks in the streets of a
·city should be protected, if the city, upon the expiration of
the original grant of franchises and privileges, capriciously
withdrew the same from the new company so as to defeat,
or seriously impair, the objects for which the corporation
·was chartered and kept in existence. There is a way to
lawfully and satisfactorily solve such questions when they
.arise, but suffice it to say they are not involved in the pres-
·ent case.

4, 5. It certainly can not be doubted that if the Augusta
·& Summerville Railroad Company accepted the act of 1889,
:it became the company's charter. This proposition was not
denied, but it was insisted that the company had not ac-
cepted this act, because it had not pursued the method
·for so doing pointed out in the act itself, viz: by surrender-
.ing the old charter before its expiration, and accepting the
new one with all its privileges and liabilities. This was
.not the exclusive manner in which the new charter could
be accepted. The company, in its corporate capacity, made
.an application to the City Council of Augusta for certain
valuable privileges and franchises, which it obtained, used,
·enjoyed, and afterwards sold to another corporation. As
:already remarked, this application recited that it was made
under and by virtue of this very act. How, then, can the

company now say it did not accept the act, or that the same is not binding upon it? Upon the plainest principles, it is estopped from so doing. In this connection see the following authorities, which are directly in point: 1 Thompson on Corporations, §101; 1 Beach on Priv. Corporations, §15; 1 Morawetz on Priv. Corporations, §23; Zabriskie *v.* C. C. & C. R. Co., 64 U. S. 381.

6. The act of December 20th, 1893, providing for the renewal of charters previously granted to railroad and other companies, manifestly could have no application except as to corporations whose charters had expired or were about to expire. A company whose charter life was, in 1889, extended for a period of fifty years from March 20th, 1896, as was the case here, had no right, in the latter year, to apply to and obtain from the secretary of State any renewal of its charter. Of course, the application with which we are now dealing was made upon the theory that the Augusta & Summerville Railroad Company had not accepted the act of 1889, but it has been shown that this theory was not well founded in fact.

7. It is clear that, under the provisions of the act of 1889 which have already been set forth, the Augusta & Summerville Railroad Company could not continue to use the streets of Augusta for the purposes specified in its original charter without again obtaining the consent of the city council.

The foregoing disposes of this case so far as relates to this company. We will now discuss the controversy between the City Council of Augusta and the steam railroad companies, the nature of which has been stated.

8. The question involved is, did the legal predecessors of these companies have the right to operate with steam power a railway longitudinally located in and along a public street in the city of Augusta? The record discloses beyond controversy that, under contracts with the city council, they did have such right, if that body had sufficient legislative

authority to grant it; and the evidence strongly impresses us that, from a moral standpoint, the justice of the case is decidedly upon the side of these corporations.  We cannot, however, in the teeth of what we believe to be the law, undertake to administer our own ideas of abstract justice. With a single exception, the legislative enactments cited and relied upon as conferring upon the City Council of Augusta authority to grant the right in question are not, in our judgment, sufficiently pertinent to require special notice.   The exception is the act of February 15th, 1856, the 24th section of which (Acts of 1855-6, p. 249) enacts: "That the City Council of Augusta shall be, and they are hereby, authorized to permit the connection by common depots, tracks or otherwise, of all railroads in said city, or any of them, upon such terms and conditions as may be fixed and agreed on between the city council and them." Before discussing this section of the act upon its merits, we will first notice some decisions rendered by this court which are relied upon by the eminent counsel who appeared here for these companies.

In *South Carolina Railroad Co.* v. *Ells*, 40 *Ga.* 87, the question was whether or not justices of the peace had jurisdiction to abate a nuisance in the city of Augusta, the alleged nuisance being the running of trains in and along Washington street in that city.  The railroad companies asserted their right to run these trains under a city ordinance which they, evidently referring to the above mentioned act of 1856, claimed had been authorized by the General Assembly; but the question whether this act did or did not confer upon the municipal corporation authority to adopt the ordinance relied upon was not passed upon, nothing in fact being decided except that the justices of the peace had no jurisdiction in the premises.

The decision in *Vason* v. *South Carolina Railroad Co.*, 42 *Ga.* 631, apparently, we do not hesitate to say, sustains the contention that the act of 1856 authorized the City

Council of Augusta to permit the legal predecessors of the steam railroad companies now before this court to use locomotives upon a track laid longitudinally in Washington street; but a close examination of this case in the light of the attendant facts and circumstances will, we think, lead to the conclusion that it is not absolute and binding authority for this position. We will now endeavor to show that it is not; and, if successful, will be left free to deal with this act, in so far as it bears upon the cases in hand, unembarrassed by anything said in the *Vason* case. Vason petitioned the City Council of Augusta to abate as a nuisance the running of trains drawn by locomotives in Washington street. The railroad companies who were defendants to this proceeding set up as a defense, "that by acts of the General Assembly, the mayor and council of Augusta had a right to allow said street to be so used, and that it had contracted with said railroad companies so as to permit such use." It is a very important fact, and one which must not be overlooked, that "the acts, ordinances of the city, and contracts alluded to, were put in evidence." The city council denied the petition, and the superior court, on certiorari, affirmed the judgment of the municipal body. The Supreme Court decided that "the use of steam engines to draw trains of cars over the *street railroad* laid down by the Augusta & Summerville Railroad Company through Washington street in the city of Augusta [was] expressly authorized by *acts* of the legislature of this State, and by *the contracts and ordinances* of the city of Augusta; and being so authorized, the running of said trains [could] not be abated as a public nuisance." In point of fact, the track in Washington street had not been laid down by the Augusta & Summerville Railroad Company; but, as will be seen, it is a significant and important fact that this court treated it as a "street railroad," and dealt with it as being under the dominion and control of the street railroad company. In the opinion, Judge McCay correctly observed:

"That the use of steam engines to draw trains of car through Washington street in the city of Augusta, thus connecting the various railroads entering the city at different points, is authorized by the contracts and ordinances of the city, is not disputed. Indeed, it is too plain for dispute." He then remarked: "The only question there can be on this point is the authority of the city to do this. It seems to us that this too is very plain. The act of February 15th, 1856, authorizes the city council to permit the connection of all railroads in the city, by common tracks, depots, or otherwise, on *such terms and conditions* as may be fixed by the city council." Further on, he said: "And the act of October 26th, 1870, in express terms, ratifies and confirms these several contracts and ordinances by which the city council has, at various times and by various contracts and ordinances, permitted and *sold* this right to use the street railroad in the manner complained of." If the above quoted statement of the judge with reference to the act of 1856 is to be taken as meaning that it, proprio vigore and without more, was sufficient to confer upon the city council authority to permit the use of steam engines in Washington street, and if it was necessary to hold this in the *Vason* case, the decision therein would be controlling now upon this point. Perhaps the judge did think the act of 1856 was, of itself alone, sufficient for the purpose stated. In perfect candor, this seems to have been his meaning; but it is equally fair to say that he also relied for the correctness of the general conclusion reached upon other acts of the General Assembly, and upon the ordinances and contracts of the city council. He expressly mentioned the act of October 26th, 1870; and though this act had not been passed when *Vason's* proceeding was instituted, its bearing upon the question at issue will presently appear. Whatever Judge McCay may have believed as to the effectiveness of the act of 1856 in the respect indicated, we are satisfied that it was by no means essential to

a proper decision of the *Vason* case that this court should, with reference to that act, go to the extent his language apparently warrants, and we do not think it meant to do so.   If so, it was dealing unguardedly with a great public question.   The decision, as a whole, was obviously based, not upon a single act, but upon legislative *acts* and municipal *ordinances*.   As before observed, these were *in evidence.*   And it is also clear that the case turned upon the then existing right of the Augusta & Summerville Railroad Company to use steam in Washington street.   It was, at the time, a municipal pet, and as such held the key to the railroad situation in Augusta.

One of the acts referred to was an amendment to this company's charter, approved December 28th, 1866, giving it the right to use dummy cars or engines over the streets of Augusta.   Then there was an ordinance adopted November 9th, 1867, granting this company "the right of using locomotive power for the movement of passenger and baggage and freight cars, on *their* tracks" on various named streets, including Washington, "during the continuance of their aforesaid contract," the contract here referred to being the special contract between the city and the company alluded to in the preliminary statement preceding this discussion.   Following the ordinance just mentioned came that of March 13th, 1868, authorizing the Augusta & Summerville Railroad Company to lease the track in Washington street from the South Carolina Railroad Company, which it did, as above seen; and accordingly, it had control of this track when *Vason's* case was heard.   At the trial of that case, all these acts and ordinances were under consideration, and it cannot be doubted that they had great weight in its determination.   We entertain no reasonable doubt that the rights and powers of the Augusta & Summerville Railroad Company were the chief factors in bringing about the judgment rendered by the city council and its affirmance by the superior court.   The act of October 26th, 1870, was ap-

proved after the decision of that court had been rendered, but before the same had been passed upon by the Supreme Court. That act expressly ratifies and confirms the ordinances of November 9th, 1867, and March 13th, 1868. Judge McCay must, therefore, have referred to it solely upon the idea that, by relation backwards, it made valid ab initio these ordinances and all that had been done under them.

The foregoing is, we believe, a fair presentation of the *Vason* case, and in view thereof we feel safe in saying that it would not do to make that case a basis for holding that the act of 1856 conferred upon the municipal government of Augusta the large power claimed for it, as above indicated. In so far as the decision of this court in the case of *South Carolina Railroad Co.* v. *Steiner*, 44 *Ga.* 546, may bear upon this question, what is said above is applicable to it also.

It only remains to show that upon principle and upon general authority the 24th section of the act of 1856 cannot be given the scope contended for. The correctness of the well settled proposition that there must be clear legislative authority to construct and operate a steam railroad along a street of a city was very properly conceded; but it was earnestly insisted that such authority was conferred by the above cited enactment, and, in this connection, that a legislative grant of power to a municipal corporation to confer privileges or franchises upon railroad companies was not subject to the rule of strict construction undoubtedly applicable to grants in derogation of the rights of the general public made directly to the companies themselves. It was argued that the General Assembly, having complete control of the streets of the city of Augusta, had made a general delegation of its sovereign authority in this regard to the City Council of Augusta; that this body thus obtained a broad discretionary power in the matter of permitting railroad companies to connect their tracks within the corporate

limits; that the manner in which this was to be done was exclusively for determination by the municipal government; and that the established canon of strict construction, which renders doubt equivalent to denial and which is always resorted to in behalf of the general public in construing the charters of private, or of such quasi public corporations as railroad companies, should not in this instance control.   So the question in its last analysis resolves itself into this: Should the usual rule for construing legislative grants of privileges and powers to corporations be relaxed when the corporation in question is a municipal one?   The rule laid down in 15 Am. & Eng. Enc. of Law, p. 1041, for the construction of municipal charters, is not, in our opinion, too strongly stated, and is fully sustained by the numerous cases cited in the note.   It is as follows: "It is the policy of the law to require of municipal corporations a strict observance of their powers.   Any doubt or ambiguity arising out of the terms used by the legislature in making a grant of power must be resolved in favor of the public; and a power cannot be exercised where it is not clearly comprehended within the words of the act, or derived therefrom by necessary implication."   We have found no case in which this rule has ever been questioned or even criticised.   It may be said to be universally recognized, and has been applied even in cases where the power conferred was coupled with a wide discretion as to the manner and extent of its exercise.   In his great work on Corporations (vol. 4, §5659) Judge Thompson lays down the following as a general rule applicable to all corporations:   "One of the leading canons for the construction of corporate charters is, that doubtful expressions in a charter or statute conferring franchises on a corporation, are to be construed in favor of the public, rather than in favor of the corporation, and that the corporation will take nothing by mere implication, unless the implication necessarily arises out of what is expressly granted."   The real reason for strictly construing grants of power to corpo-

rate bodies is, that a sound public policy requires that the interests of the general public shall not be injuriously affected by an undue exercise or abuse of powers thus conferred. The following extracts are from 1 Cook on Stockholders & Corporation Law, §3: "The theory of a corporation is, that it has no powers except those expressly given or necessarily implied. But this theory is no longer strictly applied to private corporations. A private corporation may exercise many extraordinary powers, provided all of its stockholders assent and none of its creditors are injured. There is no one to complain except the State; and the business being entirely private, the State does not interfere. Thus, fifty years ago, the courts would summarily have declared it illegal for a business corporation to become an accommodation indorser of commercial paper. But to-day, if all the stockholders assent thereto and creditors are not injured, such an act is held to be legal." "Again, the old theory of a corporation was, that it could not give away its assets. But the modern view is that a private corporation may do so if all the stockholders assent and if creditors are paid. Public policy does not require business corporations to confine themselves strictly to their express and implied powers." "In the case of railroad corporations, however, public policy does intervene and does limit the implied powers." Judge Cooley says, that "the general disposition of the courts in this country has been to confine municipalities within the limits that a strict construction of the grants of powers in their charters will assign to them; thus applying substantially the same rule that is applied to charters of private incorporation. The reasonable presumption is that the State has granted in clear and unmistakable terms all it has designed to grant at all." Cooley Const. Lim. (6th ed.) pp. 231-233. But in view of the foregoing from Mr. Cook, it would seem that there is really less reason for strictness in the case of private than of municipal corporations. As we understand the rule in question, the true test.

for determining its application in any given instance is, not whether the corporation belongs to the one class or the other, but whether the rights of the general public will be injuriously affected by a liberal rather than a strict construction of the corporation's charter. We cannot, therefore, assent to the proposition—though it was presented with great force and plausibility—that a municipality can, under a particular grant of power, take more than would a railroad company under the same words expressing the grant. Only by a clear and radical departure from the rule governing municipal charters could a municipality be held to acquire more power under specific language used by the legislature than would any other sort of corporation. All corporations—municipal, as well as those strictly private or quasi public—are mere creatures of the legislative will. Not only have they no inherent powers of their own, like ordinary persons, but not even life itself, independently of their charters. The rule of strict construction as applicable to municipal charters was recognized by this court as far back as 5th *Ga.* See *Frederick* v. *City Council of Augusta,* pp. 561, 567. The qualification immediately following the general rule above quoted from the Encyclopædia of Law has no application to the cases in hand. It is in these words: "But powers expressly granted, or necessarily implied, are not to be defeated or impaired by strict construction." The language giving the city authority "to permit the connection by common depots, tracks or otherwise, of all railroads in said city, or any of them, upon such terms as may be fixed and agreed on between the city council and them," certainly did not expressly grant, nor did it by any means necessarily imply, any right or power to use the streets of the city *longitudinally* for the purpose stated. The contemplated connections could have been made by crossing streets and condemning private property. It was not such a situation as that presented by "the Notch of the White Mountains."

It was practically conceded that if the grant to the City Council of Augusta had been made directly to the railroad companies, the right to use the streets longitudinally would not have followed. The public interests being involved, and the rule of strict construction being therefore proper, it does not seem logical to conclude that, simply because the General Assembly was addressing the city of Augusta, more was intended by the language employed in the grant than would have been the case had it been made to the railroad corporations themselves. What the city took under the act it could convey to these corporations, if it chose, but certainly no more. Most probably the intention was to give the city the power of limiting, not extending, the franchise embraced in the words used. There might, in 1856, have been good reasons for giving the municipal authorities of Augusta the large power which they undoubtedly assumed to exercise by virtue of its provisions; but we are quite sure that no such power was properly derivable from its terms. Whenever the General Assembly really means to confer such power, it should say so unequivocally; and it has done this, as to Augusta, by the act of December 23d, 1896 (Acts of 1896, p. 120), which declares plainly enough what that city may thereafter do with reference to the use of its streets by railroad companies.

*Judgment in each case affirmed. All the Justices concurring.*