## COKER et al. v. ATLANTA, KNOXVILLE AND NORTHERN RAILWAY COMPANY et al.

1. A municipal corporation is without power to vacate a public thoroughfare, unless authority so to do be conferred upon it in express terms or by necessary implication.

(a) The charter of the City of Atlanta clothes it with no such power.

(b) Authority "to open, lay out, to widen, straighten, or otherwise change" streets within the city does not comprehend the power to abandon a thoroughfare and open another to take its place over a strip of land running parallel with, but some twenty-six feet distant from, the nearest boundary line of the street sought to be vacated and devoted to a purpose inconsistent with its use by the public.

2. Though the unauthorized obstruction of a city street by the laying of railway tracks and the erection of permanent structures thereon may, as matter of law, amount to a public nuisance, none save persons who will thereby sustain injury not shared in by the public at large can maintain an equitable proceeding to enjoin the creation of such nuisance.

3. One whose property rights will be injuriously affected by the unauthorized abandonment and obstruction of a street which furnishes an important avenue of approach to his place of business, in that the closing of the street will divert travel from the thoroughfare on which his property is situated and render the same less valuable and less remunerative to him, can maintain an action to prevent the infliction of such special injury.

4. That great benefits will flow to a city from the carrying out of an ultra vires contract made in its behalf affords no reason for denying appropriate equitable relief to a citizen who attacks the contract as illegal, and whose rights will be infringed if its terms are given effect.

5. There is no merit in the defense that a property owner will not sustain damage from the unlawful closing of a street, for the reason that another street to take its place will be immediately opened, unless it be shown that the street to be opened will be permanently maintained.

(a) Evidence that the street to be substituted for that closed will afford better access to the complainant's property and will render it more valuable is not open to the objection that benefits thus arising can not be set off against the damages which he would sustain from the unauthorized abandonment and obstruction of the street to the closing of which he objects.

(b) After an ultra vires contract wherein a municipality is named as a party is wholly or partially performed by the other contracting party, a court of equity can not undertake to enjoin the city authorities from restoring to that party such fruits of the unauthorized contract as have not been dissipated but remain in the custody of the municipality.

6. Even though a citizen may by his conduct induce the authorities of a city to believe that he will not question the validity of an ordinance providing for the vacation of a public thoroughfare, he will not be estopped from attacking the ordinance at any time before definite action is taken thereunder by the parties interested in giving it effect.

Argued April 18, — Decided June 15, — Rehearing denied July 17, 1905.

Petition for injunction.     Before Judge Lumpkin.     Fulton superior court.     March 14, 1905.

The Atlanta, Knoxville and Northern Railway Company undertook to secure, for the joint benefit of itself and other railroad companies with which it was associated, terminal facilities in the City of Atlanta, affording access to Central avenue, in the heart of the city. As a part of the project, the railway company desired to acquire title to a street known as Waverly place, which divided property it had purchased from the freight-yards of one of the companies with which it was associated; to also acquire title to a lot upon which stood one of the fire-engine houses belonging to the city; and to secure the privilege of crossing certain streets intersecting a right of way leading to the property which the railway company had purchased for use as a terminal station. The City of Atlanta, acting through its general council, indicated a willingness to encourage and foster the enterprise, and negotiations between the railway company and the city council were entered into, with a view to granting to the railway company the desired privileges and conferring upon it the right to use Waverly place as it might see fit. The City of Atlanta also had a purpose of its own in view; it much desired to acquire the right to construct a viaduct across the railroad-yards of the companies associated with the Atlanta, Knoxville and Northern Railway Company, and to get from the railroad companies substantial aid in the building of this expensive structure from Washington street, on the south, to Collins street, on the north of the railroad yards. As a result of the negotiations, the city council, on December 23, 1904, adopted an ordinance which provided, in substance, as follows: The railway company was to be granted, (1) the privilege of crossing the streets intersecting its right of way to the proposed terminal station; (2) the city's fire-engine lot; (3) the street known as Waverly place; and (4) the right to cross with its tracks a portion of Washington street, at a grade which would admit of trains passing under the proposed viaduct. On the other hand, the city was to acquire from the railway company, (1) a right of way for the viaduct across the railroad-yards; (2) the sum of $50,000 to be used in building this viaduct; (3) a lot in the neighborhood upon which should be erected by the railway company a modern fire-engine

house to take the place of that granted to the railway company; and (4) the use of a street laid out across the property of that company south of Waverly place, and to be used in its stead till the city should take steps to build the viaduct and should receive from the company the $50,000 to be used in its construction, when the strip of land laid out as a street across the railway company's property should be reconveyed to that company, provided the city was not prevented by legal proceedings from so doing, the $50,000 to be paid to the city in any event. The railway company assented to the terms of the ordinance, and it was about to be carried into effect when F. M. Coker Jr. and W. S. Kendrick filed an equitable petition, therein naming the Atlanta, Knoxville and Northern Railway Company and the City of Atlanta as defendants, and praying that they be' enjoined from proceeding under the ordinance to do anything affecting the existing status. Petitioners attacked the contract evidenced by the ordinance, as ultra vires, alleged that they were the owners of property in the immediate vicinity of Waverly place that would be injuriously affected by the closing and obstruction of that street, and denied any right or authority on the part of the city to vacate it or to grant to the railway company the privilege of using the same for railroad purposes.

On the hearing no attempt was made to show that any special injury to Kendrick would result from the closing of the street, but it did appear from the uncontradicted evidence that if Waverly place should be vacated and no thoroughfare taking its place should be substituted, the market value of certain property owned by Coker would depreciate from five to ten, or possibly twenty-five per cent. The fact was also brought out at the hearing, that, subsequently to the filing of the petition for injunction, the city council had in certain respects amended the ordinance complained of. The only change therein which need be noticed is the striking of the provision for the payment by the railway company of $50,000, and the insertion in lieu thereof of the following stipulation: "Section 6. That the said railroad company, by accepting this ordinance, agrees and contracts with the City of Atlanta to pay a part of the expense or cost of the construction of said viaduct, corresponding to the amount needed to erect that part of the viaduct extending over

the tracks of the railroad from the abutment at Washington street to the abutment at Collins street, as shown on the plans of the original ordinance, approximating a distance of 393 feet; thus connecting the viaduct constructed to either side of said railroad property and completing said viaduct, provided the cost of such part of the same does not exceed $80,000, any saving to be for the benefit of the railroad, its successors and assigns. The City of Atlanta will adopt a resolution directing the mayor to execute a conveyance in its name quitclaiming all the city's right, title, and interest in and to Waverly place, as changed, to the Atlanta, Knoxville & Northern Railroad Company, its successors and assigns, at the time said railroad company, its successors and assigns, shall pay their part for the construction of said viaduct, as above provided; and the good faith of the city is hereby pledged to accordingly secure said street to said railroad company and its successors and assigns; provided, however, that should the City of Atlanta be prevented by legal proceedings from making said quitclaim conveyance, the payment for said viaduct shall nevertheless be made as herein provided." To certain evidence offered by the defendants objection was made by the plaintiffs, and the court reserved its decision as to the admissibility of this evidence until a date subsequent to the hearing, at which time the objections were overruled and an order was passed denying the injunction prayed for. To these rulings exception is taken.

*John L. Hopkins & Sons,* for plaintiff. *King, Spalding & Little, J. L. Mayson,* and *W. P. Hill,* for defendants.

FISH, P. J. (After stating the facts.) 1. "The plenary power of the legislature over streets and highways is such that it may, in the absence of special constitutional restriction, vacate or discontinue the public easement in them, or invest municipal corporations with this authority." 2 Dill. Mun. Corp. (4th ed.) § 666. "But the power must be conferred in express terms or by necessary implication, and the construction of ambiguous words alleged to confer it 'ought to be in favor of the common right of highway.' Highways can not, in any event, be discontinued for the purpose of devoting them to private and inconsistent uses." Elliott, Roads & Streets (2d ed.), § 875. Such is the law as heretofore announced by this court. *Marietta Chair Co.* v. *Henderson,* 121 *Ga.* 403–404. No express power to vacate a public

thoroughfare has been conferred by the General Assembly upon the City of Atlanta. On the contrary, its control over streets and alleys has been in terms limited to the right "to open, lay out, to widen, straighten, or otherwise change" the same. Acts of 1874, p. 131, § 60. To exclude the general public from the enjoyment of a street and to devote it to a purpose wholly inconsistent with its use as a thoroughfare is not such a "change" therein as the city's charter contemplates. That the city has power to abandon or vacate the street known as Waverly place was not claimed by counsel for the defendants in error, but their contention is that the "change" in that street provided for by the ordinance adopted by the city council is one which the municipality has power, under the above-quoted provision of its charter, to effect. The facts are: Waverly place is to retain its name, but change its residence, if the carrying out of the plan outlined in the ordinance is not interfered with. That street is but one block in length, and connects Central avenue on the west with Washington street on the east, the two streets last named running parallel to each other and at right angles to Waverly place. On the north adjoin the railroad-yards now used by the companies associated with the defendant railway company, while on the south lies property all of which is either owned or controlled by that company. Washington street extends no further north than the railroad-yards; Central avenue continues northward beyond them; both streets extend for a considerable distance southward and are much used thoroughfares, as is also Waverly place. The banking-house of Coker is on the west side of Central avenue and faces the open street called Waverly place. It is proposed to so change the location of the latter street as that it shall occupy a strip of land belonging to the railway company, of equal length and width, lying some twenty-six feet south of the present southern boundary of Waverly place where it connects with Central avenue and some thirty feet south of the point where its southern boundary touches Washington street. In other words, Waverly place is to be moved bodily over eighty-six feet in a southerly direction and deposited upon the lands of the railway company, over twenty-six feet distant from its extreme southern boundary as now located, so that its extreme northern boundary will be eighty-six feet away from its present northern

boundary.   The journey involves eighty-six feet of travel, the street being sixty feet wide and every inch of it journeying southward; none of it is to remain at its present abode, but it is in its entirety to seek other quarters provided for it further down Washington street.   The proposed "change" in Waverly place is one of location or residence, and after it moves there will be nothing to identify it but its name; for the ordinance contemplates that all luggage, in the shape of sidewalks and other personal effects, shall be left behind.   The street is not an asset which the city can move from place to place at will.   The so-called "change" in the street practically amounts to an entire abandonment of it as a thoroughfare and the opening of a new street through the property of the railway company.   Under the ordinance adopted by the city council, that company can acquire no right, title, or interest in or to any portion of Waverly place; the contract which the city council sought to enter into with the railway company was clearly ultra vires, and the same is not enforceable at the instance of either party thereto.   Not until power derived from the legislature is conferred upon the city can it become legally bound by, or have any right to enter into, such a contract as that embodied in the ordinance under discussion.

2.  It does not follow, however, that merely because the city was without power to close Waverly place and permit the railway company to use it for terminal facilities, the plaintiffs were entitled to the injunction they sought against the railway company to prevent it from taking possession of the street or making any alterations therein.   They are undoubtedly correct in their contention, that, as matter of law, the building of terminal structures in the street would amount to a public nuisance (*Daly* v. *Railroad Co.*, 80 *Ga.* 793), as would also the using of the street as a switching yard or place for the delivery of freight (*Atlantic & Birmingham R. Co.* v. *Montezuma*, 122 *Ga.* 1), or the unauthorized laying of its tracks longitudinally along the surface of the street.   *Davis* v. *Railroad Co.*, 87 *Ga.* 605; *Augusta R. Co.* v. *Augusta*, 100 *Ga.* 701.   But unless, from the unauthorized use of the street, the plaintiffs will suffer injury not common to the general public, peculiarly affecting their property rights and causing special damage to them, they can not maintain an action to either enjoin the nuisance or to re-

cover damages for its maintenance. *Coast Line R. Co.* v. *Cohen,* 50 *Ga.* 451; *East Tenn. Ry. Co.* v. *Boardman,* 96 *Ga.* 356. It was admitted, on the hearing in the court below, that the railway company would, unless enjoined, occupy the strip of ground now known as Waverly place longitudinally with its tracks and terminal structures; and on the argument here counsel for the plaintiffs' insisted that the banking-house of Coker would be depreciated in market and rental value, and the enjoyment of the property injuriously affected, by the noise, smoke, and cinders incident to conducting upon the street the operations of the railway company. However, no anticipated injury to Coker thus arising was either alleged or proved. His property does not abut on Waverly place, but is situated on the west side of Central avenue. The precise manner in which the railway company expected to use Waverly place was not shown, and that they expected to so use it as to injuriously affect Coker's property is purely a matter of inference. Bare conjecture can not adequately supply proper allegations and proof, and the court below would have been unwarranted in granting an injunction upon the assumption that the use to which the street was to be put would result in special damage to either of the plaintiffs.

3. If for any reason Coker was entitled to the relief sought, it was upon the theory that the unlawful closing of the street by the city and the placing of obstructions therein by the railway company would deprive him of the benefits of one of the principal avenues of approach to his place of business, rendering it less valuable and less remunerative to him. If such would be the result of the closing of the street, then Coker would be entitled to an injunction to prevent the visitation upon him of this special injury. *Georgia Southern R. Co.* v. *Harvey,* 84 *Ga.* 372, s. c. 90 *Ga.* 66; *Brunswick & Western R. Co.* v. *Hardey,* 112 *Ga.* 604; *Savannah & Western R. Co.* v. *Woodruff,* 86 *Ga.* 94; *S., F. & W. Ry. Co.* v. *Gill,* 118 *Ga.* 737, 745–6. The evidence introduced in his behalf showed that this would undoubtedly be the case in the event Waverly place were closed and no street to take its place were opened and maintained.

4. As a matter of defense, the defendants offered the affidavits of a number of persons who therein expressed their conviction,

based upon a knowledge of all the surrounding facts and circum-stances, that the building of a viaduct from Washington street to the north side of the railroad-yards, so as to connect that street with thoroughfares in the northern portion of the city, was a great public necessity, and that the swap of the city's property and property rights for the property and property rights moving from the railway company was a most excellent business proposi-tion and was to the undoubted advantage of the city and the citizens at large. This evidence was objected to as irrelevant, but was held by the court to be admissible. It should not have been taken into consideration. The issue was, not whether or not the city council had made a good bargain with the railway company, but whether or not that bargain was ultra vires.

5. The defendants also sought to overcome the prima facie case made out by the plaintiffs, by showing that the new street to be opened across the property of the railway company would not only fully take the place of Waverly place, but would afford better access to Coker's place of business and render his property more valuable. Evidence to this effect was objected to, but was held to be admissible. The plaintiffs' objections were that the evidence was irrelevent and immaterial, (1) because the unlawful occupancy of Waverly place by the railway company would be a public nuisance, and no benefits flowing to plaintiffs from the opening of the new street could be set off against the injury in-flicted by closing Waverly place, and (2) "because the rights which the city would acquire in the proposed new street were not equal in character or nature with those which it possessed in the present Waverly place, the latter rights being perpetual, while the rights in the new street were conditioned upon the happening of the event provided for in the ordinance, at which time the right to use the strip of ground known as 'New Waverly place' would be lost to the city and the public." The first of these objections was not well taken. The purpose of the evidence was, not to set off benefits against damages, but to show that the closing of Waverly place, under the terms of the ordinance, would not result in any special injury to Coker or damage to his property. If such were the truth of the matter, he could have no standing in court as an aggrieved party. *Farkas* v. *Towns,* 103 *Ga.* 154.

The second objection is not to be so easily disposed of. The

ordinance imposed upon the city the moral, if not the legal, obligation of reconveying title to the new street to the railway company so soon as that company should comply with its undertaking to share the expense of building the viaduct, provided the city should not be "prevented by legal proceedings from making said quitclaim conveyance." In other words, the city was bound to reconvey and contracted to reconvey if within its power to do so. If it had the legal right to do so when called on by the railway company at the appointed time, then the new street would be legally closed and Coker would lose all benefits flowing from the substituted street. So if Coker is to be denied the privilege of objecting to the closing of Waverly place, on the ground that another and better street will be substituted for it, the fact must be made to clearly appear that the new street can not hereafter be legally closed at the will of the city, despite the express provision in the ordinance pledging the good faith of the city to reconvey it to the railway company unless "prevented by legal proceedings." Could the city be so prevented by any proceeding which Coker might hereafter bring to enjoin the closing of that street? Neither in his capacity of citizen and taxpayer nor in his capacity as property owner could he be heard to assert that he had any greater interest in the street than had the City of Atlanta, or stood in any better situation to object to the abandonment thereof. If the railway company proposed to make to the city a dedication of the new street, by way of gift and without condition, then the new street would stand upon the footing of other public thoroughfares, and could not be legally vacated at the will of the city. But the company does not contemplate any dedication to the public, but has entered into a cold business proposition to convey the proposed new street to the city, on condition that the city will reconvey the same, if within its power, in the event specified in the ordinance. Suppose Coker had waited till the city undertook to do so in accordance with its terms. Aside from being met with the charge of laches, he would have to overcome the difficulty of successfully pointing out some reasonable ground upon which a court of equity could base a right to interpose and enjoin the city from making a conveyance such as the ordinance calls for. That ordinance evidences an ultra vires contract which the court could not enforce or give recognition to.

Coker could not assert that it was valid in so far as it provided for a conveyance of the new street to the city, but invalid in so far as it provided for a reconveyance to the railway company; he could not in part ratify and in part repudiate the contract, or insist that the city was entitled to hold on to any of the fruits of the same. To return to the railway company so much of the fruits of this ultra vires bargain as had not been dissipated would be the equitable duty of the city, as to do so would be in accord with good conscience and would impose no burden nor injury upon any citizen, property owner, or taxpayer. See 1 Dill. Mun. Corp. (4th ed.) § 462, note; 29 Am. & Eng. Enc. L. (2d ed.) 54, and authorities cited. Certainly no court of equity could consistently undertake to interfere with such restoration, whether made under color of the ultra vires contract by way of compliance with its terms, or voluntarily under a proper recognition of the true character of the contract. The city could then reply to Coker: treating the ordinance as valid, no more is being done than the city is bound to do under its express terms; if the ordinance be invalid, as claimed, then it is the right and duty of the city to restore to the railway company the strip of land conveyed as a street, and to take proper steps to reopen Waverly place to the public. Even though the city might at the same time decline to take such steps, the court could not attempt to compel the city to take action, and Coker would be remitted to the remedy, pointed out in *Gill's* case, 118 *Ga.* 737, to have the nuisance created by the railway company in Waverly place abated at his instance, the city authorities not themselves exercising the right to have it abated in accordance with the provisions of the Civil Code, § 4762. Now, if ever, is the time for Coker to complain of the invalid ordinance and object to the closing and obstruction of Waverly place before the public nuisance therein is created; and the defense that he would suffer no injury because of the opening of the proposed new street was not tenable.

6. Counsel for the defendants in error call attention to the fact that there was no evidence going to show that Kendrick would sustain any special injury by the closing of the street to the public, and insist that Coker had by certain conduct, prior to the passing of the ordinance, estopped himself from setting up its invalidity. It appears, that, pending the negotiations between

the railway company and the city authorities, Coker attended some of the meetings of a special committee to which council had referred the matter of granting to the railway company the privileges for which it asked, that he was very actively in favor of the construction of the Washington street viaduct, and that he had expressed himself as willing to have Waverly place entirely closed up and abandoned, if the viaduct could be secured. But though Coker attended these meetings, he did not address the committee upon the subject under discussion, nor favor or acquiesce in the adoption of the ordinance which the city council passed. He did make to council a written proposition to loan to the city $25,000 for six months, with interest at the rate of 4% per annum, this sum to be used in the construction of the viaduct according to the plans and specifications of file in the office of the city engineer; though this offer was not accepted. On the hearing below, counsel for Coker stated that he would submit to all injury to his property without pay, if, as a part of the ordinance and the delivery of Waverly place to the railway company, the building of the viaduct was unconditionally secured and an appropriation for the beginning of the work made; but that this had not been done; that the ordinance in its present shape did not, in his opinion, insure the erection of the viaduct; and that he therefore intended to stand upon his legal rights. The defendants introduced a resolution presented to council for passage by one of its members, providing that the sum of $20,000, to be taken from the tax fund, should be appropriated for the purpose of beginning the construction of the Washington street viaduct. What action was taken by council upon this resolution did not appear. Such are the facts upon which the defendants rely as creating an estoppel against Coker. If what he did influenced council in adopting the invalid ordinance of which he complains, it is strange that this should be so. Granting that such is the case, however, no one has as yet been hurt by what he did. The doctrine of equitable estoppel must have a subject-matter to work upon. In due time Coker repented of his folly, if, indeed, he committed any. He brings to the attention of the court the attempted commission of a public wrong and the unjustifiable usurpation of a power which has never been conferred upon the city council. In no sense can it be said that Coker

is in pari delicto with the defendants, and for that reason is not a person to whom the court can becomingly grant the relief for which he prays.

*Judgment reversed. All the Justices concur, except Simmons, C. J., absent, and Lumpkin, J., disqualified.*