## A97A2135. JACKSON et al. v. GEORGIA LOTTERY CORPORATION.
### (491 SE2d 408)

ELDRIDGE, Judge.

Plaintiffs George Jackson, George Walker, and Curtis Harris filed suit individually, and "on behalf of all other persons similarly situated,"[1] against the Georgia Lottery Corporation ("GLC"), asking the Superior Court of Fulton County to declare as a matter of law that the GLC's lottery games "Cash Three" and "Quick Cash" are illegal and unconstitutional, because these games go beyond the provisions for lottery games provided by constitutional amendment and by statute and, as operated, constitute illegal casino gambling. Plaintiffs also sought an injunction prohibiting the operation of these two games, and damages in the amount of all proceeds from the two games, since the proceeds were allegedly obtained through illegal gambling as proscribed by OCGA § 13-8-3.

The GLC filed a motion for summary judgment, claiming: (a) protection from a monetary judgment by virtue of sovereign immunity; and (b) the monetary damages sought by plaintiffs are precluded since, pursuant to statute, proceeds from the GLC's lottery games are designated for the state's educational fund, thereby making impossible the forfeiture of proceeds derived from the disputed games. The trial court granted the GLC's motion, finding that: (a) plaintiffs' claims were barred by the doctrine of sovereign immunity; and (b) even if plaintiffs' claims had merit, the "impossibility" of obtaining requested monetary damages precluded recovery since, by law, proceeds from the "Cash Three" and "Quick Cash" games must go to the state's educational fund. *Held*:

1. (a) The threshold consideration is whether, in the instant case, the Georgia Lottery Corporation is entitled to the protection afforded by the doctrine of sovereign immunity. In addressing this issue, we have no choice but to confront the split of authority apparent in decisions from our high court regarding what constitutes a state "agency," so as to implicate the doctrine of sovereign immunity. See *Miller v. Ga. Ports Auth.*, 266 Ga. 586 (470 SE2d 426) (1996), and *Thomas v. Hosp. Auth. of Clarke County*, 264 Ga. 40 (440 SE2d 195) (1994).

Our Legislature made very clear that the Georgia Lottery Corporation "shall be deemed to be an *instrumentality* of the state, and *not* a state agency, and a public corporation." (Emphasis supplied.) OCGA § 50-27-4. In *Thomas*, our Supreme Court examined the issue of sovereign immunity from tort as it applies to a hospital authority

---

[1] Plaintiffs incorrectly styled their case as a class action when it had not been certified as such under the provisions of OCGA § 9-11-23.

and "distinguish[ed] the state and its political subdivisions from *instrumentalities* created by the state to carry out various functions." (Emphasis supplied.) *Thomas*, supra at 41. The court in *Thomas* determined that such an "instrumentality," which is a "mere creature of the [s]tate, having distinct corporate entity," is *not* protected by sovereign immunity. Id. at 42. "Since a hospital authority, though an instrumentality of government, is not, in any sense, an agency or department of the state, the nature of its function is irrelevant; it is not, by the language of the statute, entitled to the protection of sovereign immunity." Id.

Notwithstanding, in *Miller* our Supreme Court determined that the Georgia Ports Authority ("Authority") *was* to be afforded the protection of sovereign immunity from tort, although the Authority is not a department or agency of the state, but is, instead, simply a separate entity created by the state, much like the hospital authority in *Thomas* and the GLC in this case. See *Scarlett v. Ga. Ports Auth.*, 223 Ga. 417, 418 (1) (156 SE2d 77) (1967). However in *Miller*, the issue was whether the Authority was a "state agency" for purposes of the notice provision of the Georgia Tort Claims Act, OCGA §§ 50-21-21 to 50-21-37 (1994). The court in *Miller* based its determination on the language of the Tort Claims Act, which Act, for purposes of tort liability, delineates those entities to which the defense of sovereign immunity is *not* available, but toward which entities certain procedural requirements, such as notice, must be followed in order to properly institute a tort claim. Specifically, under the relevant portion of the Tort Claims Act, OCGA § 50-21-22 (6), a "State government entity" is defined as "a state office, agency, authority, department, commission, board, division, instrumentality, or institution." From this listing of entities to which the defense of sovereign immunity was *not* available, the *Miller* court determined that, were it not for the waiver established by the Act, perforce, sovereign immunity *would* apply to the listed entities: "Our earlier cases distinguishing between instrumentalities of the state and state agencies are not dispositive since both instrumentalities and agencies are included in the act's definition of the state." *Miller*, supra at 588. Thus, without overruling *Thomas* and the number of cases upon which *Thomas* relied for its narrow definition of what constitutes the "state" or a political division thereof for purposes of sovereign immunity from tort, the *Miller* court found that the doctrine of sovereign immunity applied to the Authority for the purpose of proceedings under the Tort Claims Act.

The logical progression of these two lines of cases leads to the unsettling conclusion that an entity may be a "state agency" entitled to sovereign immunity from torts in some types of cases, but not in others. However, we leave the cutting of that Gordian knot to our high court, and simply note, determinatively, that all parties agree

this case sounds in contract and is not a tort claim.[2] See also OCGA § 13-8-3; *Talley v. Mathis*, 265 Ga. 179 (453 SE2d 704) (1995). Thus, contrary to the position of the GLC in this case, we do not look to the Tort Claims Act for guidance as to GLC's governmental status. The Tort Claims Act is a procedural vehicle which outlines the process, such as notice, that must be followed when filing a *tort* suit against certain governmentally created entities. The language of the Tort Claims Act is much broader than that of the Constitution which grants sovereign immunity only to "the state and all of its departments and agencies"; the Tort Claims Act statutorily extends such definitions to include "instrumentalities." OCGA § 50-21-22 (6). However, the Act's broad, inclusive definition of the types of governmentally created entities for which notice is required and toward which the doctrine of sovereign immunity will *not* be applied does not impact upon the narrow class of state agencies and departments *entitled* to the protection of sovereign immunity under the Constitution. The plain language of the Georgia Constitution of 1983 provides for the protections of sovereign immunity to extend only to the "state or its departments, agencies, officers, or employees," and not to "instrumentalities" such as the GLC. Ga. Const. of 1983, Art. I, Sec. II, Par. IX (a). To the extent that a conflict may exist, the Act must give way to Constitutional provisions. See, e.g., *Hiers v. City of Barwick*, 262 Ga. 129 (2) (414 SE2d 647) (1992).

We further look to the plain language of the statute creating the GLC, OCGA § 50-27-4, which asserts that the GLC is *not* a state agency but an "instrumentality" of the state, and the line of cases, outside the Tort Claims Act, which have construed the status of an "instrumentality," such as the GLC, and have determined that such entity is not entitled to the defense of sovereign immunity. See, e.g., *Thomas*, supra.[3] Persuasive, also, are additional relevant characteristics that distinguish an "instrumentality" of the state from a state "agency" to which sovereign immunity should be extended: "Indeed, the [GLC] was established as a separate, self-sufficient entity, and the General Assembly is not required to appropriate any funds either to satisfy debts of the [GLC] or to pay any of the [GLC's] costs of oper-

---

[2] The state's defense of sovereign immunity is waived only as to an action ex contractu for breach of a *written* contract, not as to an implied contract as presented in the allegations of the plaintiffs. See *Dept. of Transp. v. Fru-Con Constr. Corp.*, 206 Ga. App. 821 (3) (426 SE2d 905) (1992). Thus, a determination as to sovereign immunity remains an issue. Ga. Const. of 1983, Art. I, Sec. II, Par. IX (a).

[3] See also *Richmond County Hosp. Auth. v. McLain*, 112 Ga. App. 209 (144 SE2d 565) (1965); *Bradfield v. Hosp. Auth. of Muscogee County*, 226 Ga. 575, 587 (176 SE2d 92) (1970); *Toombs County v. O'Neal*, 254 Ga. 390 (330 SE2d 95) (1985); *Cox Enterprises v. Carroll City-County Hosp. Auth.*, 247 Ga. 39, 45 (273 SE2d 841) (1981); *Intl. Longshoremen's Assn. v. Ga. Ports Auth.*, 217 Ga. 712, 716 (1) (124 SE2d 733) (1962); *Ga. Ports Auth. v. Arnall*, 201 Ga. 713, 722 (41 SE2d 246) (1947).

ation. [Cit.] Accordingly, any judgment against the [GLC] is not an obligation of the state, and extension of sovereign immunity to the [GLC] is not necessary to protect 'the public purse.' " *Miller*, supra at 590 (Carley, J., dissenting).

Accordingly, after a review of the above constitutional and statutory provisions, as well as the applicable case law, we find that the Georgia Lottery Corporation is not a state "agency" entitled to the defense of sovereign immunity under the facts and law of the instant case.[4] *Thomas*, supra. Thus, the trial court's granting of summary judgment based upon the GLC's defense of sovereign immunity was incorrect.

(b) The trial court also determined that even if "the plaintiffs' claims have merit, recovery would be impossible where constitutional and statutory mandates [sic] that the proceeds from the games in question are to be directed to the state's educational fund." However, such ruling puts the cart before the horse.

Accepting for the moment that plaintiffs' claims "have merit" and that "Cash Three" and "Quick Cash" are, as plaintiffs assert, illegal because they go beyond the scope of the lottery games for which the GLC's constitutional and statutory mandates provide, then it matters not that the proceeds therefrom are designated for the state's education fund. Any such money will have been obtained by the GLC through actions ultra vires, which are void, and the benefits of such unlawful acts may not be retained by the GLC. "There is no doubt but that equity will exercise jurisdiction to restrain acts or threatened acts of public officers which are ultra vires and beyond the scope of their authority, outside their jurisdiction, unlawful or without authority." (Citations and punctuation omitted.) *Head v. Browning*, 215 Ga. 263, 267 (109 SE2d 798) (1959). Further, this result would obtain regardless of whether the benefits are statutorily designated to be transferred to the state education fund because the GLC may not retain and transfer benefits derived from an act ultra vires. "[W]here the officers of a corporation, though without authority to do so, do in fact execute a contract in behalf of the corporation, and the fruits of it are received, retained, and applied to corporate uses, the corporation will be liable thereon notwithstanding any want of authority in its officers." *Flatauer Fixture &c. Corp. v. Garcia &*

---

[4] It is interesting to note, without deciding such, that the Legislature's clear characterization of the Georgia Lottery Corporation as *not* a state agency would permit the GLC to function outside the Administrative Procedures Act, would permit the GLC to, perhaps, avoid the Open Records Act and Open Meetings provisions of our Code, and would ensure the GLC's autonomy in decision-making, without repeated Legislative, i.e., public, oversight. However, one cannot help but inquire: Should such expressed freedom from governmental encumbrance also permit governmental protection, such as sovereign immunity, whenever State "agency" status becomes attractive?

*Assoc.*, 99 Ga. App. 685, 688 (109 SE2d 818) (1959). "That benefits may flow . . . in carrying out an ultra vires contract . . . affords no reason for denying appropriate equitable relief to one who attacks the contract as being illegal, and whose rights will be infringed if its terms are given effect. [Cit.]" *Norton v. City of Gainesville*, 211 Ga. 387, 392 (86 SE2d 234) (1955); *Coker v. Atlanta &c. R. Co.*, 123 Ga. 483 (4) (51 SE 481) (1905); see also *Merchants Bank of Macon v. Central Bank of Ga.*, 1 Ga. 418 (1846). Thus, absent a determination as to the legality of the disputed games, themselves, the fact that pursuant to statute the benefits therefrom are earmarked for the state treasury provides no basis for the granting of summary judgment, and plaintiffs may have a chose in action as to the benefits that have been generated by the allegedly unlawful games.

In addition, pursuant to statute, "as nearly as practical" 45 percent of all monies taken in by the GLC is designated for prizes, and 35 percent of all monies taken in is to be termed "net proceeds" and is allocated for the state education fund.[5] See OCGA § 50-27-13 (a) (2), (3) (b) (1). This leaves approximately 20 percent of all monies taken in by the GLC from its numerous lottery games that have no specific statutorily prescribed designation at all, except as open-ended "operating expenses"; these considerable, additional monies may be utilized to satisfy any judgment against the GLC, which corporation has the power "[t]o sue and be sued in contract and in tort[.]" OCGA § 50-27-9 (a) (1). Thus, the fact that only a *portion* of the GLC's proceeds may be statutorily allocated for other purposes would not provide a basis for summary judgment because of the "impossibility" of a monetary recovery. The trial court's granting of summary judgment on such basis was incorrect.

Nonetheless, the standard of review of the trial court's grant of summary judgment is a de novo review of the evidence and law to determine whether there is any genuine issue of material fact as to the elements required to establish the cause of action as stated by plaintiffs in their complaint. *Artlip v. Queler*, 220 Ga. App. 775, 776-777 (470 SE2d 260) (1996). The GLC, in moving for summary judgment, must show that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the plaintiffs, warrant judgment as a matter of law. *City of Thomasville v. Shank*, 263 Ga. 624 (437 SE2d 306) (1993). In this case, the facts are not in dispute. The issue is the purely legal question of whether "Quick Cash" and "Cash Three" are, as plaintiffs assert, illegal games as a matter of law. Accordingly, we direct our attention to the consti-

---

[5] In this way the state may claim that "all" proceeds from the lottery go to the education fund.

tutional and statutory provisions authorizing the operation of lottery games.

The constitutional amendment, Ga. L. 1991, p. 2035, § 1, revised Art. I, Sec. II, Par. VIII, of the Constitution of 1983 to provide that the General Assembly may enact legislation providing for the operation and regulation of a lottery by or on behalf of the state and providing for the distribution of the proceeds thereof, which amendment was approved by a majority of qualified voters during the General Election on November 3, 1992. Thereafter, given the authority under the Constitution, the Legislature enacted the "Georgia Lottery for Education Act." Ga. L. 1992, p. 3173, § 2; OCGA § 50-27-1 et seq. The Act created the GLC and delineated its powers. OCGA §§ 50-27-2 (2); 50-27-4; 50-27-9. The Act defined the scope of permissible games to be operated by the GLC; permitted the GLC's governing board to adopt regulations, policies, and procedures regulating the conduct of lottery games, including the type of games to be played; and provided for the distribution of the proceeds. OCGA §§ 50-27-3; 50-27-10; 50-27-12. This was an authorized delegation of legislative power to the executive branch, i.e., the GLC.

Under the Act, permissible "lottery" games are broadly defined as "*any* game of chance approved by the board and operated pursuant to this chapter, including, but not limited to, instant tickets, on-line games, and games using mechanical or electronic devices but excluding pari-mutuel betting and casino gambling as defined in this Code section." (Emphasis supplied.) OCGA § 50-27-3 (9). Under the referenced Code section, "Casino gambling means a location or business for the *purpose* of conducting illegal gambling activities, but excluding the sale and purchase of lottery tickets or shares as authorized by this chapter." (Emphasis supplied.) Id. at (4).

Under these provisions, it is clear that the creation and operation of "Cash Three"[6] and "Quick Cash"[7] games are a lawful exercise of the GLC's authority, and the games themselves, as implemented, do not violate the statutory definition of a lawful lottery game. Con-

---

[6] "Cash Three" was implemented August 10, 1993. To play, a player marks three numbers on a lottery ticket in one sequential order and/or in numerical combinations; players may play at $.50 or $1 at a time; drawings are daily. As of August 26, 1996, "Cash Three" proceeds totaled $1,649,722,331; approximately $580,261,136 of these proceeds have been transferred to the state education fund.

[7] "Quick Cash" was implemented on December 15, 1995. To play, a player selects from one to ten numbers on a lottery ticket which is then read by a computer at the time of selection; players may play between $1 and $100 at a time in $1 increments; every five minutes, ten winning numbers are randomly chosen by the computer and displayed on a video monitor connected to the computer terminal; the amount of prize money depends on the total of correctly selected numbers. As of August 26, 1996, the proceeds from "Quick Cash" totaled $53,740,450; from these proceeds, $18,813,186 have been transferred to the state education fund.

trary to plaintiffs' assertions, such games do not fall within the statutory definition of improper "casino gambling" as they constitute the purchase of lottery tickets, which is exempted therefrom under the statute; further, there is no contention before this Court that these disputed games are played in locations operated for the *purpose* of conducting illegal gambling activities.

Moreover, plaintiffs' allegations that the GLC "acts as a 'house' or 'bank' which participates in the games, taking on all comers, paying all winners and collecting from all losers" does not demonstrate a constitutional or statutory violation. Plaintiffs' description is apropos to the operations of any game of chance and would not cause "Cash Three" or "Quick Cash" to exceed the bounds of a lawful lottery game under the statutory definitions.

In sum, "Cash Three" and "Quick Cash" are proper under the law. If these games, as operated, go beyond the types of lottery games anticipated by the people when voting in favor thereof, they do not exceed the bounds of the constitutional power granted to the General Assembly to enact legislation for the operation of a lottery game. Further, these disputed games do not exceed the bounds of the subsequent legislation which created the GLC, broadly defined what constitutes a "lottery" game, and gave the GLC extensive power over the types of games to be played, as well as the conduct and implementation of those games. If the reins are to be pulled back on lottery games in this state, it is not within the power of this Court to do so as long as the law remains as it stands. Accordingly, we find from a review of the record in a light most favorable to plaintiffs that summary judgment was warranted as a matter of law, and the trial court's granting of summary judgment, right for any reason, is affirmed.[8]

2. The trial court specifically found that due notice regarding the hearing on the motion for summary judgment had been sent to all parties. Plaintiffs have failed to demonstrate otherwise. "The burden is on the party alleging error to show it affirmatively by the record." *Campbell v. Powell*, 206 Ga. 768, 770 (58 SE2d 829) (1950). Further, there is no transcript of the April 9, 1997 hearing from which we could determine whether this issue was ever raised in the trial court. It is well-settled that this Court will not review errors raised for the first time on appeal. *City of College Park v. Pichon*, 217 Ga. App. 53, 55 (456 SE2d 686) (1995). Accordingly, as there is nothing before us to review, we are unable to address this enumeration of error. *Kelly v. Pierce Roofing Co.*, 220 Ga. App. 391 (1) (469 SE2d 469) (1996).

*Judgment affirmed. Birdsong, P. J., and Ruffin, J., concur.*

---

[8] *Precise v. City of Rossville*, 261 Ga. 210, 211 (3) (403 SE2d 47) (1991).

DECIDED AUGUST 11, 1997 —
RECONSIDERATIONS DENIED AUGUST 25, 1997 —

*William R. McCracken, Christopher G. Nicholson*, for appellants.
*Thurbert E. Baker, Attorney General, Daniel M. Formby, Deputy Attorney General, John B. Ballard, Jr., Senior Assistant Attorney General, Harold D. Melton, Assistant Attorney General*, for appellee.