A04A0749. GAY v. GEORGIA DEPARTMENT OF CORRECTIONS et al.
(606 SE2d 53)

ADAMS, Judge.

Ralph Gay appeals the trial court's order granting summary judgment to the Stone Mountain Memorial Association ("Association") and partial summary judgment to the Georgia Department of Corrections ("DOC"), and denying his motion for partial summary judgment. We affirm for the reasons set forth below.

Ralph Gay filed a negligence claim against the DOC seeking damages for physical injuries incurred while he was an inmate at the Rockdale-DeKalb Probation Detention Center ("PDC"). According to the complaint, Gay was on a required work detail when a DOC employee directed him to cut a limb from a tree. Gay climbed an unsecured ladder to perform the task and subsequently fell 25 feet to the ground, injuring his neck, back, arm, and leg.

In an amendment to his complaint, Gay added the Association as a defendant and asserted negligence and breach of contract claims against DOC and the Association. Gay claimed his work detail was governed by a contract between the DOC and the Association (the "Contract"); that the Contract required the Association to provide a safe workplace for the inmates; and that he was a third-party beneficiary under the Contract.

Gay filed a motion for partial summary judgment, arguing that (i) the Association was not subject to the Georgia Tort Claims Act and was not entitled to ante litem notice thereunder, and (ii) he was a third-party beneficiary to the Contract. The Association filed its own motion for summary judgment, contending Gay's failure to provide ante litem notice caused his negligence claims against the Association to fail, and that Gay's contract claims failed because he was not a third-party beneficiary to the Contract. The DOC also moved for partial summary judgment on Gay's contract claims. The trial court denied Gay's motion for partial summary judgment and granted the Association's motion for summary judgment and the DOC's motion for partial summary judgment.

To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and

that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law. OCGA § 9-11-56 (c); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). To obtain summary judgment, a defendant need not produce any evidence, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. Id. Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant. *Supchak v. Pruitt*, 232 Ga. App. 680, 682 (1) (503 SE2d 581) (1998).

The pertinent facts are not in dispute. Gay was injured while on an inmate work detail providing services under the Contract. The Contract required the DOC to provide the Association with four inmate work details for labor on public works projects. Each work detail consisted of one correctional officer and up to twelve inmates. The DOC had the exclusive right and responsibility, through the correctional officer, to supervise the inmates. The Association retained the right to direct the correctional officer as to the work to be performed by the inmates. The Association was obligated to pay the DOC $30,552 per detail, per year.

1. Because Gay failed to give ante litem notice, the validity of Gay's negligence claim against the Association depends upon whether Gay was required to pursue the claim subject to the Georgia Tort Claims Act, OCGA § 50-21-20 et seq. See, e.g., *Grant v. Faircloth*, 252 Ga. App. 795-796 (556 SE2d 928) (2001) (trial court failed to acquire subject matter jurisdiction where plaintiff did not give ante litem notice in accordance with the Georgia Tort Claims Act). In turn, the application of the Georgia Tort Claims Act depends upon whether the Association is entitled to sovereign immunity from tort claims under Article I, Section II, Paragraph IX of the Georgia Constitution, as this is the immunity waived under the Georgia Tort Claims Act, subject to the exceptions and limitations which include the ante litem notice requirement. See *Miller v. Ga. Ports Auth.*, 266 Ga. 586, 587-588 (470 SE2d 426) (1996).

The Georgia Constitution provides that "sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e). The General Assembly, through the Georgia Tort Claims Act and subject to the limitations set forth therein, has waived sovereign immunity for torts of state officers and employees acting within the scope of their official duties or employment. OCGA § 50-21-23 (a).

In waiving sovereign immunity under the Georgia Tort Claims Act, the General Assembly chose to define "State" more broadly than might be suggested by Article I, Section II, Paragraph IX (e) of our Constitution, which references the state and its "departments and agencies." "State," for purposes of the Georgia Tort Claims Act, is defined as the "State of Georgia and any of its offices, agencies, authorities, departments, commissions, boards, divisions, instrumentalities, and institutions, but does not include counties, municipalities, school districts, other units of local government, hospital authorities, or housing and other local authorities." OCGA § 50-21-22 (5). Our Supreme Court has apparently accepted this definition in extending sovereign immunity for purposes of our Constitution and the Georgia Tort Claims Act:

> [W]e are guided by our opinion in *Miller v. Georgia Ports Authority*, 266 Ga. 586 (470 SE2d 426) (1996), in which we interpreted both Article I, Section II, Paragraph IX and the Georgia Tort Claims Act, OCGA § 50-21-20 et seq., to extend sovereign immunity to the State of Georgia, its offices, agencies, authorities, departments, commissions, boards, divisions, instrumentalities, and institutions. See OCGA § 50-21-22 (5), (6). Looking to the legislation creating the Georgia Ports Authority and the public purposes for which it was created, we held in *Miller* that the Georgia Ports Authority is a State agency entitled to raise the defense of sovereign immunity.

*Youngblood v. Gwinnett Rockdale Newton Community Svc. Bd.*, 273 Ga. 715, 716 (1) (545 SE2d 875) (2001). In deciding that the Georgia Ports Authority was a state agency for purposes of sovereign immunity, our Supreme Court in *Miller* reasoned that

> The dictionary defines the word "agency" as "a department or other administrative unit of government." The 1945 act creating the authority designated it as the "state" ports authority charged with the power to develop, improve, and maintain the harbors and seaports of the state. As the state administrative unit responsible for the state docks, the Georgia Ports Authority is a state agency entitled to sovereign immunity.

(Footnotes omitted.) 266 Ga. at 587. The *Miller* majority did not directly address the dissent's argument that as a "mere instrumentality" of the state the Georgia Ports Authority was not entitled to sovereign immunity, and that its function was irrelevant. Id. at 590.

Gay argues that notwithstanding the definition of "State" for purposes of the Georgia Tort Claims Act, the Association's creating legislation shows it is not a state department or agency, but is a separate instrumentality not subject to sovereign immunity. The Association has its own legal identity demonstrated by, among other things, the power to acquire property, to contract, and to borrow money. OCGA § 12-3-194. In particular, Gay points to OCGA § 12-3-195, which provides that "[t]he rentals contracted to be paid by the state or any department, agency, or institution of the state to the [A]ssociation . . . shall constitute obligations of the state for the payment of which the good faith of the state is pledged." Thus, he contends, there is a clear difference between the Association on the one hand and the state and its departments and agencies on the other. The flaw in Gay's argument is that it is essentially the same position put forth by the dissent in *Miller* with respect to the Georgia Ports Authority. See 266 Ga. at 589-590. The majority in that case looked to the Georgia Ports Authority's public purpose under its creating legislation and was unpersuaded by the minority's claim that its existence as a state instrumentality rendered its function irrelevant for purposes of sovereign immunity.

Gay also relies on *Thomas v. Hosp. Auth. of Clarke County*, 264 Ga. 40 (440 SE2d 195) (1994) and *Jackson v. Ga. Lottery Corp.*, 228 Ga. App. 239 (491 SE2d 408) (1997). In *Thomas*, our Supreme Court held that hospital authorities are not entitled to sovereign immunity because they are neither the state nor a department or agency of the state. 264 Ga. at 42 (1). In *Jackson*, we concluded that sovereign immunity did not extend to the Georgia Lottery Corporation. 228 Ga. App. at 242 (1). Neither of these cases applies the Georgia Tort Claims Act directly, as *Jackson* involved a contract claim and the court in *Thomas* does not address the act. However, *Jackson* and *Thomas* contain language indicating that, at least outside the context of the Georgia Tort Claims Act, instrumentalities of the state are not entitled to sovereign immunity. See *Jackson*, 228 Ga. App. at 241 (1) (noting "the line of cases, outside the Tort Claims Act, which have construed the status of an 'instrumentality' . . . and have determined that such entity is not entitled to the defense of sovereign immunity"). In *Jackson*, we noted the apparent tension between *Thomas* and *Miller* insofar as "[t]he logical progression of these two lines of cases leads to the unsettling conclusion that an entity may be a 'state agency' entitled to sovereign immunity from torts in some types of cases, but not in others. However, we leave the cutting of that Gordian knot to our high court. . . ." Id. at 240 (1).

Ultimately, *Thomas* and *Jackson* are not helpful to Gay because, while they may show a potential conflict in the law, it is clear that *Youngblood* and *Miller* are on point here and therefore control our

analysis. Accordingly, although a state "instrumentality," the Association may nevertheless be entitled to assert sovereign immunity to Gay's negligence claim.[1] See *English v. Fulton County Bldg. Auth.*, 266 Ga. App. 583 (597 SE2d 626) (2004) (building authority, an instrumentality of the state, was entitled to assert defense of sovereign immunity). Under the approach mandated by *Youngblood* and *Miller*, we must examine the legislation creating the Association and the public purposes for which it was created to determine if the Association is entitled to sovereign immunity. See *Youngblood*, 273 Ga. at 716 (1).

The Association is created as "a body corporate and politic and instrumentality and public corporation of this state." OCGA § 12-3-192 (a). See also OCGA § 50-16-3.1 (describing the Association as a "state authority" not authorized to sell real property). The purposes of the Association are "(1) To preserve the natural areas situated within the Stone Mountain Park area; (2) To provide access to Stone Mountain for Georgia's citizens; and (3) To maintain an appropriate and suitable memorial for the Confederacy." OCGA § 12-3-192.1. For administrative purposes, the Association is assigned to the Department of Natural Resources. OCGA § 12-3-192 (b). It may exercise the police powers of the state within the park. OCGA § 12-3-194.1 (a) (1). With some exceptions, property and activities of the Association are not subject to state or local taxation. OCGA § 12-3-219. The Association is designated as performing an essential governmental function. OCGA § 12-3-219. The governor is "authorized and directed" to transfer available state funds to the Association for use in acquiring Stone Mountain. OCGA § 12-3-197.

The creating legislation shows that the Association performs a public function which has state-wide benefits. The Association's maintenance of a confederate memorial is not a public function which could reasonably be said to have a counterpart in private enterprise. Compare *Thomas*, 264 Ga. at 42-43 (2) (hospital authority in competition with private hospitals for patients). The authorization and direction to commit state funds to the Association in the acquisition

---

[1] Gay points to a number of cases involving the Association in which its sovereign immunity was not raised as an issue. See *Quick v. Stone Mountain Mem. Assn.*, 204 Ga. App. 598 (420 SE2d 36) (1992); *Hogue v. Stone Mountain Mem. Assn.*, 183 Ga. App. 378 (358 SE2d 852) (1987); *Abee v. Stone Mountain Mem. Assn.*, 169 Ga. App. 167 (312 SE2d 142) (1983); *Lloyd v. Stone Mountain Mem. Assn.*, 165 Ga. App. 679 (302 SE2d 602) (1983); *Brannon v. Stone Mountain Mem. Assn.*, 165 Ga. App. 120 (299 SE2d 176) (1983); *Herrington v. Stone Mountain Mem. Assn.*, 119 Ga. App. 658 (168 SE2d 633) (1969), rev'd, *Stone Mountain Mem. Assn. v. Herrington*, 225 Ga. 746 (171 SE2d 521) (1969). We do not see how a failure to address the issue of sovereign immunity in these cases is helpful in deciding the issue now. All but one of the decisions cited by Gay were rendered before Article I, Section II, Paragraph IX of the Georgia Constitution was approved in 1990, and the 1992 *Quick* decision was primarily decided under the Recreational Property Act.

of the park, OCGA § 12-3-197, demonstrates an intent to provide some level of state financial support for the Association. OCGA § 12-3-195 (a). Compare *Jackson*, 228 Ga. App. at 241-242 (1) (noting self-sufficiency of Georgia Lottery Corporation as factor weighing against finding the GLC to be entitled to sovereign immunity).

After considering the public purposes for which the Association was created, we hold that the Association is a state department or agency for purposes of Article I, Section II, Paragraph IX of the Georgia Constitution. It follows that Gay was required to provide ante litem notice in accordance with the Georgia Tort Claims Act in order to pursue his tort claim against the Association. As he did not do so, the trial court correctly granted summary judgment to the Association as to Gay's negligence claim.

2. Gay contends that the trial court erred in granting summary judgment to the Association and the DOC on his contract claim because he was a third-party beneficiary of the Contract. We disagree.

"The beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." OCGA § 9-2-20 (b). However,

> [i]n order for a third party to have standing to enforce a contract . . . it must clearly appear from the contract that it was intended for his benefit. The mere fact that [the third party] would benefit from performance of the agreement is not alone sufficient. Unless such an intention is shown on the face of the contract, defendant is under no duty [to the third party] and consequently plaintiff acquires no right as the third party beneficiary. A contract is intended to benefit a third party when the promisor engages to the promisee to render some performance to a third person.

(Citations and punctuation omitted.) *Scott v. Mamari Corp.*, 242 Ga. App. 455, 457 (1) (530 SE2d 208) (2000). See also *Anderson v. Atlanta Committee for the Olympic Games*, 273 Ga. 113, 117 (4) (537 SE2d 345) (2000) (in personal injury cases, an injured party may not recover as a third-party beneficiary for failure to perform a duty imposed by contract unless the contracting parties intended to confer a direct benefit upon the plaintiff to protect him from physical injury).

Gay contends that the Contract terms requiring the Association to provide a safe workplace, safety gear and necessary protective clothing were intended to benefit inmates at the Rockdale-DeKalb PDC, including Gay, by providing for their safety while working pursuant to the Contract. In Section 2, entitled "Workplace Safety," the Contract provides:

The [Association] agrees to provide a safe workplace for inmate work details in accordance with State law. The [Association] shall be responsible for the coordination between inmate work details and other workers in the workplace. The [DOC] shall be responsible for custody of inmates at all times, including security, meals, and medical care. Each party agrees to comply with applicable laws, rules, regulations and orders of federal, State and local governments in the performance of the Work.

In Section 3, "Vehicles, Equipment, and Supplies," the Contract provides in relevant part: "The [Association] agrees to supply suitable vehicles for the transport of inmate work details to and from the location or locations of the Work and to supply all necessary tools, equipment and supplies for the performance of the Work, including all safety gear and any necessary protective clothing."

We conclude these safety-related provisions were not intended to benefit the inmates. For example, the Association does not agree to render any specifically identified performance to the inmates. Thus the Contract differs from agreements considered in cases such as *Starrett v. Commercial Bank of Ga.*, 226 Ga. App. 598 (486 SE2d 923) (1997), relied upon by Gay, where a divorce settlement agreement obligated the parties to sell property and pay the proceeds to a named third-party bank, which was found to be a beneficiary of the contract. See also *City of Atlanta v. Atlantic Realty Co.*, 205 Ga. App. 1, 6 (3) (421 SE2d 113) (1992) (provision requiring third party Atlantic Realty Company to be named insured on all property damage insurance policies required by the contract gave Atlantic standing to sue the promisor for breach of that provision).

Furthermore, the Contract, when viewed as a whole, tends to show that the Association's safety-related promises are not intended to benefit the inmates. See *McAbee Constr. Co. v. Ga. Kraft Co.*, 178 Ga. App. 496, 498 (343 SE2d 513) (1986) (cardinal rule of contract construction is to ascertain the intention of the parties by looking at the contract as a whole). The Contract makes it clear that the Association is not obligated to undertake the responsibilities of the DOC with respect to the inmates. The Contract provides:

The [DOC] shall have the exclusive right and responsibility, through the correctional officer supervising each inmate work detail, to direct and supervise inmates with respect to the Work to be performed hereunder, provided that the [Association] shall at all times have the right and responsibility to direct the correctional officer concerning Work to be performed by inmates.

Consistent with this division of responsibility, the DOC's obligations under the "Workplace Safety" provision include responsibility for "custody of inmates at all times, including security, meals, and medical care." Viewed as a whole, the Contract shows that the inmates' safety remained the primary responsibility of the DOC, and the Association's promise to provide equipment, including safety gear and protective clothing, is consistent with the Association's responsibility with respect to the work to be performed and not an undertaking on behalf of the inmates.

The Association's promise to provide a safe workplace does arguably benefit prisoners assigned to the work details. However, the benefit is incidental to the Contract. See, e.g., *Tyler v. PepsiCo, Inc.*, 198 Ga. App. 223, 227 (400 SE2d 673) (1990) (although beverage company retained a contractual right to inspect its bottler's facilities, and product safety was a purpose of inspection, there was no evidence that the contract was specifically intended to benefit the plaintiff). Furthermore, the Association's promise to provide a safe workplace "in accordance with State law" is better characterized as an acknowledgment of its general responsibilities than a specific undertaking on behalf of the inmates.

We are unpersuaded by authority relied on by Gay. In addition to *Starrett*, Gay relies most heavily on *Plantation Pipe Line Co. v. 3-D Excavators*, 160 Ga. App. 756 (287 SE2d 102) (1981). This case involved a contractor's promise that "[a]ny damage to existing structures or utilities shall be repaired or made good by the Contractor (defendant) at no expense to the Owner (DeKalb County)." Id. at 757. We determined the third-party owner of a utility damaged by the contractor could assert a claim as a third-party beneficiary. Id. at 759. While *Plantation Pipe Line* is helpful to Gay through its holding that a third-party beneficiary need not be named in a contract so long as he is a member of a relatively small group of intended beneficiaries, id., the contractor's promise to repair and "make good" on damages to structures and utilities is a specific benefit afforded to third parties and is not comparable to the Association's general promise to abide by state law in providing a safe workplace.

Gay also relies on *Beverly v. Macy*, 702 F2d 931 (11th Cir. 1983) and *Owens v. Haas*, 601 F2d 1242 (2nd Cir. 1979). These cases do not apply Georgia law and are also factually distinguishable. In *Owens*, the Second Circuit ruled that it would "appear likely" that a prisoner could claim to be a third-party beneficiary of a contract between the U. S. Bureau of Prisons and defendant county, under which the county agreed to house and care for federal prisoners. Id. at 1251. However, the contract at issue in *Owens* contained numerous provisions with regard to prisoner safety, and the county agreed to oversee

the federal prisoners in its custody. Id. at 1250, n. 9. In contrast, the DOC, and not the Association, was "responsible for custody of inmates at all times."

In *Beverly*, the issue was whether the plaintiff was a third-party beneficiary under a servicing contract between the National Flood Insurers Association ("NFIA") and Hartford Insurance Group. 702 F2d at 931. The court held that the plaintiff was a third-party beneficiary of the servicing contract, and NFIA had an obligation to send the plaintiff a premium due notice under her flood insurance policy. Id. at 943. The court found it "particularly significant that the NFIA was created for the sole purpose of participating in a government program designed to provide the fullest possible flood insurance protection to the public." Id. at 942. Here, the Association was not created to supervise prisoners and to maintain their safety, and so the Association's safety-related promises need not be viewed in a context which would tend to show an intent to benefit the inmates. And while the DOC did have responsibility for inmate safety, the Contract shows no delegation of responsibility in that area to the Association and no specific undertaking by the DOC on behalf of the inmates apart from its existing duties. Based on the foregoing, we conclude that Gay was not a third-party beneficiary under the Contract, and the trial court correctly granted summary judgment to the Association and the DOC as to Gay's contract claims.

3. Gay contends that the trial court erred in failing to grant his motion for partial summary judgment. As he has not prevailed in showing the trial court erred in granting summary judgment to the Association or partial summary judgment to the DOC, it necessarily follows that the trial court did not err in denying Gay's motion for partial summary judgment.

*Judgment affirmed. Ruffin, P. J., and Eldridge, J., concur.*

DECIDED OCTOBER 8, 2004 — 

*Orr & Orr, E. Wycliffe Orr, Sr., Ralph S. Goldberg*, for appellant.
*Thurbert E. Baker, Attorney General, Bryan F. Dorsey, Rutherford & Christie, Carrie L. Christie, Laura V. Benesh*, for appellees.